**<u>ORAL ARGUMENT NOT SCHEDULED</u>**

**UNITED STATES COURT OF APPEALS FOR THE
DISTRICT OF COLUMBIA CIRCUIT**

BEYOND NUCLEAR, INC. and THE SIERRA CLUB, INC.
*Petitioners,*

v.

UNITED STATES NUCLEAR REGULATORY COMMISSION
and the UNTIED STATES OF AMERICA,
*Respondents,*

NUCLEAR ENERGY INSTITUTE, et al.,
*Intervenors.*

No. 24-1318

━━━━━━━━━━━━

On Petition for Review of an Order of the
United States Nuclear Regulatory Commission

**PETITIONERS' INITIAL REPLY BRIEF**

━━━━━━━━━━━━

Diane Curran
Harmon, Curran, Spielberg, & Eisenberg, L.L.P.
1725 DeSales Street N.W., Suite 500
Washington, D.C. 20036
240-393-9285
Email: dcurran@harmoncurran.com

Caroline Leary
Environmental Working Group
1250 I St N.W.
Washington, DC 20005
202-667-6982
Email: cleary@ewg.org

Counsel for Petitioners

May 27, 2025

## TABLE OF CONTENTS

TABLE OF AUTHORITIES. ....................................................................i

GLOSSARY. ....................................................................................vi

INTRODUCTION. ............................................................................1

ARGUMENT. ...................................................................................3

I.    NRC'S APPELLATE ARGUMENTS IN DEFENSE OF ITS FAILURE TO CONSIDER THE EFFECTS OF LONG-TERM AGING AND CLIMATE CHANGE ON REACTOR ACCIDENT RISK VIOLATE THE ADMINISTRATIVE PROCEDURE ACT. ...................................3

II.   NRC VIOLATED NEPA BY FAILING TO CONSIDER THE LONG-TERM EFFECTS OF AGING ON ACCIDENT RISK. ........................7

      A. NRC Fails to Support its Claim That Long-Term Aging Effects Are Not Reasonably Foreseeable. ................................................7

      B. NRC Errs in Claiming That Expected Regulatory Compliance, Ongoing Oversight, and Updating the 1996 License Renewal GEIS Satisfied NEPA. ..................................................... 9

         1. NRC errs in claiming that expected regulatory compliance satisfies NEPA. ..................................................... 9

         2.  Standing alone, ongoing oversight during renewed operation does not satisfy NEPA. ........................................ 13

         3. NRC precedent precludes it from treating the 2024 GEIS as a mere "update" to the 1996 License Renewal GEIS because the 1996 GEIS covered only initial license renewal and did not consider the environmental impacts of subsequent license renewal. ................14

C. NRC's Vague Assertions That the GEIS Considered the Effects of Aging Reactor Components on Accident Risk During the Subsequent License Renewal Term Violates the NEPA "Hard Look" Standard. ........................................................................16

III.   NRC VIOLATED NEPA BY FAILING TO CONSIDER THE EFFECTS OF CLIMATE CHANGE DURING BOTH INITIAL LICENSE RENEWAL AND SECOND LICENSE RENEWAL TERMS. ............18

A. NRC's Claim That It Is Incapable of Assessing the Effects of Climate Change on Accident Risk is Not Plausible. ......................................18

B. NRC Fails to Support its Alternative Claim That It Considered the Effects of Climate Change on Accident Risk. ...................................19

1. The record does not support NRC's assertion. ............................20

2. NRC's legal rationales for its asserted determination of no significant impact are erroneous. ..................................................21

C. NRC's Other Rationalizations for Failing to Evaluate the Effects of Climate Change are Arbitrary and Capricious. ...................................23

IV.   NRC'S CLAIM THAT THE EFFECTS OF CLIMATE CHANGE ON ACCIDENT RISK CAN BE ADDRESSED BY A GENERIC FINDING OF NO SIGNIFICANT IMPACT IS CONTRADICTED BY THE AGENCY'S DETERMINATION THAT CLIMATE CHANGE IMPACTS ARE SITE-SPECIFIC. ..........................................................25

V.   THE COURT SHOULD VACATE ALL PARTS OF THE FINAL RULE AND THE GEIS. ....................................................................................27

VI.   CONCLUSION . ........................................................................................28

## TABLE OF AUTHORITIES

**Judicial Decisions**

*Baltimore Gas & Elec. Co. v. NRDC,* 462 U.S. 87 (1983). .....................8, 7, 18, 20

*Citizens for Safe Power v. NRC,* 524 F.2d 1291(D.C. Cir. 1975). ...................10, 11

*Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U. S. 402 (1971). ...........1, 3

*Dep't. of Homeland Sec. v. Regents of the Univ. of Cal.,* 591 U.S. 1 (2020). ..1, 3, 6

*Dep't of Transp. v. Public Citizen,* 541 U.S. 752 (2004). ................................12, 18

*Limerick Ecology Action v. NRC,* 869 F.2d 719 (3rd Cir. 1989). ....................10, 11

*Michigan v. EPA,* 576 U.S. 743 (2015). ...............................................................1, 3

*Nat'l Highway Traffic Admin. v. Herrington,* 768 F.2d 1355 (D.C. Cir. 1985). ......7

*Nevada v. Dep't of Energy*, 457 F.3d 78 (D.C. Cir. 2006). ..................................2, 8

*N.J. Conservation Found. v. FERC*, 111 F.4th 42 (D.C. Cir. 2024). ...... 2, 8, 20, 25

*New York v. Nuclear Regulatory Comm'n,*
681 F.3d 471 (D.C. Cir. 2012). ...................................... 1, 3, 12, 13, 14, 16, 21, 25

*New York v. Nuclear Regulatory Comm'n,*
824 F.3d 1012 (D.C. Cir. 2016). ............................................................14, 17, 25

*Public Citizen v. Nat'l Highway Traffic Safety Admin.,*
824 F.2d 256 (D.C. Cir. 1988). ..................................................................7, 10, 17

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989). .................. 21

*Town of Winthrop v. FAA*, 535 F.3d 1 (1st Cir. 2008)). ....................................... 23

*Van Ee v. EPA,* 202 F.3d 296 (D.C. Cir. 2000). ....................................................26

*Vermont Yankee Nuclear Power Corp. v. Natural Resources
Defense Council, Inc.*, 435 U.S. 519 (1978). ..........................................................12

**Statutes**

Administrative Procedure Act, 5 U.S.C. §§ 551-559. ......................................... 1, 3

  5 U.S.C. § 706. ....................................................................................1

Fire Grants and Safety, Advance Act, Pub. L. 118-67,
138 Stat 1447, 1448 (July 9, 2024). ........................................................................25

Atomic Energy Act, 42 U.S.C. § 2011, et seq. ........................................................10

Fiscal Responsibility Act of 2023, Pub. L. 118-5,
137 Stat 10, § 321 (June 3, 2023). ...........................................................................23

National Environmental Policy Act,
42 U.S.C. § 4331-4370. ............................................... 1-4, 7-14, 16-19, 21, 24-25

**Regulations**

10 C.F.R. § 2.206. ....................................................................................................11

10 C.F.R. § 2.309. ....................................................................................................11

10 C.F.R. § 51.71(d). ..........................................................................................17, 24

**Administrative Decisions**

*Duke Energy Carolinas, LLC, et al.,* 95 N.R.C. 40 (2022). ....................................15

*Fla. Power & Light Co.,* 95 N.R.C. 26 (2022). ......................................................15

**Miscellaneous**

NRC Digest, https://www.nrc.gov/docs/ML2505/ML25051A094.pdf (last visited May 26, 2025). ........................................................................................15

NRC Subsequent License Renewal webpage, *https://www.nrc.gov/reactors/operating/licensing/renewal/subsequent-license-renewal.html#completed* (last visited May 26, 2025). ...........................................15

# GLOSSARY

Pursuant to Circuit Rule 28(a)(3), the following is a glossary of acronyms and abbreviations used in this reply brief:

| | |
|---|---|
| DOE | U.S. Department of Energy |
| EIS | Environmental Impact Statement |
| Final Rule | Final Rule on Review |
| GEIS | Generic Environmental Impact Statement |
| JA | Joint Appendix |
| NEPA | National Environmental Policy Act |
| NRC | U.S. Nuclear Regulatory Commission |
| NRC-DOE Degradation Assessment | Expanded Material Degradation Assessment |
| Petitioners | Beyond Nuclear, Inc. and the Sierra Club, Inc. |
| 1996 GEIS | Generic Environmental Impact Statement for License Renewal of Nuclear Plants (1996) |
| 2013 GEIS | Generic Environmental Impact Statement for License Renewal of Nuclear Plants (2013) |
| 2024 GEIS | Generic Environmental Impact Statement for License Renewal of Nuclear Plants (2024) |
| 2017 Lessons Learned Report | Generic Aging Lessons Learned Report for Subsequent License Renewal (2017) |

# INTRODUCTION

In proposing to rely on the Generic Environmental Impact Statement for License Renewal of Nuclear Plants (NUREG-1437, August 2024) ("2024 GEIS") to support initial and subsequent license renewal decisions, the U.S. Nuclear Regulatory Commission ("NRC") has failed to meet its obligations under the National Policy Act ("NEPA") and this Court's decision in *New York v. Nuclear Regulatory Commission*, 681 F.3d 471, 478–79, 483 (D.C. Cir. 2012) ("*New York I*") by ignoring two central, reasonably foreseeable environmental risks: the effects on reactor accident risk of long-term aging reactor components on accident risk in a subsequent license renewal term (*i.e.,* 60-to-80 years of operation) and climate change during both initial and subsequent license renewal terms.

 NRC now seeks to obscure that failure with *post-hoc* rationalizations that violate the Administrative Procedure Act because they are made for the first time by NRC 's counsel on appeal and have no support in the "record" below. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420, 413 n.30 (1971) (quoting 5 U.S.C. § 706). Thus, at the outset, NRC's arguments must be rejected under the "'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020) (quoting *Michigan v. EPA,* 576 U.S. 743, 758 (2015)).

1

Even assuming for purposes of argument that the Court could lawfully consider NRC's *post-hoc* arguments, they are inconsistent with NEPA and other governing precedents, internally inconsistent, and illogical. Further, NRC fails to provide any evidence in support of its alternative opposing claims that either long-term aging and climate change effects on accident risk were too speculative to warrant consideration or that the 2024 GEIS actually considered those effects and found they did not make a significant contribution to accident risk.

Finally, NRC fails to provide a reasonable basis for its assertion that climate change effects on accident risks can be evaluated generically. That assertion is squarely at odds with the 2024 GEIS itself, which recognizes that climate impacts are inherently region and site-specific, necessitating plant specific analysis and consideration of mitigation alternatives, as required by NEPA. Therefore, because they fail to demonstrate that the GEIS "contains sufficient discussion of the relevant issues and opposing viewpoints [to demonstrate that] the agency's decision is fully informed and well-considered," NRC's arguments fail to satisfy NEPA's "hard look" standard. *N.J. Conservation Found. v. FERC*, 111 F.4th 42, 54 (D.C. Cir. 2024) (quoting *Nevada v. Dep't of Energy*, 457 F.3d 78, 93 (D.C. Cir. 2006)).

As a result of NRC's legal and factual errors, the agency lacks a lawful basis for binding generic determinations in the accompanying Final Rule, Renewing

2

Nuclear Power Plant Operating Licenses—Environmental Review, 89 Fed. Reg. 64166, 64195 (Aug. 6, 2024) (JA_), that the environmental impacts of reactor accidents in initial and subsequent license renewal terms are "SMALL." Accordingly, the Court should follow *New York I* by reversing and vacating the Final Rule and remanding it to the agency.

## ARGUMENT

### I.    NRC'S APPELLATE ARGUMENTS IN DEFENSE OF ITS FAILURE TO CONSIDER THE EFFECTS OF LONG-TERM AGING AND CLIMATE CHANGE ON REACTOR ACCIDENT RISK VIOLATE THE ADMINISTRATIVE PROCEDURE ACT.

It is a "'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" *Dep't of Homeland Sec.*, 591 U.S. at 20 (quoting *Michigan v. EPA*, 576 U.S. at 758). This limitation is rooted in the Administrative Procedure Act's requirement that a reviewing court must base its decision on the "whole record." *Citizens to Preserve Overton Park, Inc.*, 401 U. S. at 420, 413 n.30.

The "record" of this case as presented by NRC consists primarily of the 2024 GEIS. The GEIS gives only one reason, stated simply and unequivocally, for refusing Petitioners' demand to consider the effects on accident risk of long-term aging and climate change: that both of those issues are "outside the scope" of the license renewal NEPA review and the GEIS. GEIS at A-211 and A-212 (JA_, __)

3

(aging); GEIS at A-221 and A-222 (JA__, __) (climate change). Instead, NRC

asserted that these issues are committed exclusively to its safety review. *Id*.[1]

On appeal, NRC completely abandons its "out-of-scope" rationale for

refusing to address the effects of long-term aging and climate change on accident

risk, as if it was never written. Instead, NRC now implicitly acknowledges that

NEPA *does apply* to Petitioners' concerns. And NRC now offers new and

inconsistent NEPA-based defenses: either that Petitioners' concerns did not merit

consideration because they were speculative; or, in the alternative, that NRC *did*

consider them and then found they had no significant effect on accident risk. These

internally contradictory NEPA-based rationalizations share one common flaw: they

do not appear in the record below.

For example, with respect to the effects of long-term aging on accident risk,

NRC now asserts that the GEIS did not need to consider the effects of long-term

aging on accident risk because they are "worst-case" and not "reasonably

foreseeable." NRC Br. 24, 39. Elsewhere, in a complete contradiction, NRC asserts

that it *did* evaluate the effects of long-term aging on accident risk. *See* NRC Br. 2

(asserting that NRC "has assessed in the Rule and the Generic EIS the reasonably

---

[1] The Final Rule does not give any reasons for NRC's refusal to consider the
effects on accident risk of long-term aging of safety equipment or the effects on
accident risk on climate change.

foreseeable impacts of aging and of the risks of an accident"); NRC Br. 35 (asserting that NRC gave "thorough consideration of the possible contribution of aging components to severe accident risks"); NRC Br. 37 (asserting that NRC "did not invoke its Part 54 [license renewal-related safety] regulations to avoid or replace a NEPA analysis; instead, the agency reasonably relied on anticipated compliance with them in attempting to identify (and not overstate) the most likely outcome of a severe accident."). Neither of these new and contradictory arguments relates to the "out-of-scope" defense made in the administrative record.

Similarly, NRC asserts for the first time on appeal that it did not try to "forecast" how climate change trends affect accident risk because they are too "quickly developing" and "subject to revision." NRC Br. 47. *See also* NRC Br. 51 (asserting that NRC has determined that the effects of climate change, while not presumptively "remote and speculative," "will not meaningfully alter any particular plant's risk profile").[2] Yet, at the same time, NRC contradictorily states

---

[2] While NRC purports to support this assertion with a citation to the GEIS at A-222 (JA_), the cited portion of the GEIS does not state that the risk analysis explicitly considered the effects of climate change on accident risk. Instead, it vaguely asserts that:

> [E]xisting and updated information show continued large margins to the 95 percent [upper confidence bound] from the 1996 [License Renewal] GEIS and support the conclusion that the impact of severe accidents is SMALL. The information considered by the NRC staff reflected *updated information* about site-specific external events and hazards. The large margin can

that it "*did* recognize the potential long-term impact of climate change on accident risk as part of its overall analysis of external threats." NRC Br. 52. These contradictory statements beg the questions of whether NRC considered the effects of climate change on accident risk at all, and, if it did, what information it considered in determining that climate change impacts will "not meaningfully alter any particular plant's risk profile" in light of its claim to have excluded consideration of climate change trends. The answers cannot be found in the record, which does not support or refute either of NRC's alternative contradictory assertions.

Thus, instead of providing a better explanation of NRC's determination in the GEIS that long-term aging and climate change impacts are "out of scope," NRC serves up a smorgasbord of new and contradictory theories on appeal, apparently hoping the Court will choose one. The Court should refuse to consider these new arguments because they "bear[] little relationship" -- and here no relationship at all -- to the record below. *Dep't of Homeland Sec.,* 591 U.S. at 21–22.

---

account for a *variety of uncertainties*, *including imperfectly quantified factors in the risk analyses.*

*Id.* (emphasis added). Whether or not NRC actually accounted for climate change effects on accident risk in the grab-bags of "updated information," "variety of uncertainties" and "imperfectly quantified factors" remains entirely unknown.

6

## II.     NRC VIOLATED NEPA BY FAILING TO CONSIDER THE LONG-TERM EFFECTS OF AGING ON ACCIDENT RISK.

### A. NRC Fails to Support its Claim That Long-Term Aging Effects Are Not Reasonably Foreseeable.

NRC asserts that the GEIS did not need to consider the effects of long-term aging on accident risk because they are "worst-case" and not "reasonably foreseeable." NRC Br. 25, 40. *See also* NRC Br. 2 (refusing to "speculate" about future aging effects on accident risk). Considering the record below, however, NRC's assertion is "'far from self-evidently true.'" *Public Citizen v. Nat'l Highway Traffic Safety Admin.*, 848 F.2d 256, 267 (D.C. Cir. 1988) (quoting *Nat'l Highway Traffic Safety Admin. v. Herrington*, 768 F.2d 1355, 1432 (D.C. Cir. 1985)). As early as 2014, when NRC began to consider subsequent license renewal, NRC's technical staff concluded the safety effects of aging equipment during a subsequent license renewal term were foreseeable enough to warrant amendment of NRC's safety regulations. *See* Pet. Br. 13–14 (citing NRC Memorandum SECY-0016 at 9 (Jan. 31, 2014) (JA_)). In response, the Commission requested and obtained a massive five-volume study that confirmed the NRC staff's concerns regarding "gaps in knowledge" and "uncertainties" regarding the unique and heretofore uncharted behavior of safety equipment after 60 years of reactor operation and therefore recommended more research. Pet. Br. 14–15 (quoting *Expanded Materials Degradation Assessment,* Vol. 1 at iii (JA_), 3

(JA_) (NUREG/CR-7153, Oct. 2014) ("*NRC-DOE Degradation Assessment*")).

NRC's "bald assertion" on appeal that the long-term effects of aging on accident

risk are speculative or reflective of a "worst-case" outcome is fundamentally at

odds with the conclusions of NRC Memorandum SECY-2014-0016 and the *NRC-*

*DOE Degradation Assessment*. *Public Citizen,* 848 F.2d at 267. *See also N.J.*

*Conservation Found.*, 111 F.4th at 51 (quoting *Nevada*, 457 F.3d at 93) ("To meet

the hard look standard, an EIS must "contain[] sufficient discussion of the relevant

issues and opposing viewpoints [to demonstrate that] the agency's decision is fully

informed and well-considered.").

    In addition, contrary to Intervenors' assertion, Int. Br. 18, generally pointing

to "a conservative methodology for addressing uncertainty" does not amount to the

"careful consideration and disclosure" required by *Baltimore Gas & Elec. Co. v.*

*NRDC,* 462 U.S. 87, 98 (1983). Further, it is inconsistent with NEPA's

requirement to demonstrate that "uncertainties" in a generic environmental impact

analysis are "not sufficient to affect the outcome of any individual licensing

8

decision." *Id*. NRC therefore fails to demonstrate "reasoned decision-making based on a 'hard look' at the relevant factors." *Public Citizen,* 848 F.2d at 267.

**B. NRC Errs in Claiming That Expected Regulatory Compliance, Ongoing Oversight, and Updating the 1996 License Renewal GEIS Satisfied NEPA.**

To the extent NRC contends that the GEIS *did consider* the effects on accident risk of long-term aging, NRC Br. 2, these claims are based on erroneous legal interpretations of NEPA and governing precedents.

**1. NRC errs in claiming that expected regulatory compliance satisfies NEPA.**

NRC claims to rely on expected regulatory compliance to satisfy NEPA. NRC Br. 36. And the GEIS itself confirms that an assumption of regulatory compliance is foundational to NRC's failure to consider the effects of long-term aging of safety equipment on accident risk.[3] But a general assumption of future compliance with agency regulations, standing alone without identification of

---

[3] For example, the GEIS makes it clear that NRC's quantitative risk analysis did *not* consider aging effects in setting safety equipment failure rates, based on an assumption of regulatory compliance. According to the GEIS, NRC's risk analysis assumed that safety equipment fails at a "constant" rate, "*thus ignoring the impact of aging on failure rates.*" GEIS at A-212 (JA_) (emphasis added). The GEIS' reason for not considering aging effects on safety equipment in setting failure rates in the risk analysis is that "the full suite of regulatory programs (license renewal, Maintenance Rule, operational requirements, etc.)" are "designed to help keep the appropriate components near a constant failure rate (random)." *Id.*

9

specific regulations or an accompanying environmental impact analysis, is insufficient to demonstrate NEPA compliance. *Public Citizen,* 848 F.2d at 267–68.

NRC cites *Public Citizen* for the unremarkable proposition that agencies may rely on "expected compliance with regulations" to "evaluate environmental impacts." NRC Br. 36. However, NRC overlooks case law establishing that "it is 'unreasonable to suppose that [environmental] risks are automatically acceptable, and may be imposed upon the public by virtue of the [Atomic Energy Act], merely because operation of a facility will conform to the Commission's basic health and safety standards.'" *Limerick Ecology Action v. NRC,* 869 F.2d 719, 730 (3rd Cir. 1989) (quoting *Citizens for Safe Power v. NRC,* 524 F.2d 1291, 1299 (D.C. Cir. 1975)). While NRC may assume that licensees will comply with its "basic health and safety standards" for license renewal, these regulations do not address the unknowns and uncertainties attendant on operation of aging nuclear reactors for periods as long as 60 to 80 years. To the contrary, NRC declined a recommendation to promulgate regulations addressing the uncertainties and unknowns identified in NRC Memorandum SECY-2014-0016 and the *NRC-DOE Degradation Assessment. See supra* p. 7–8. Therefore, under *Limerick Ecology*

10

*Action* and *Citizens for Safe Power,* NEPA required NRC to consider these factors

affecting environmental risk.

Moreover, contrary to its assertion, NRC is not excused from this obligation

by the fact that the *2017 Generic Aging Lessons Learned Report for Subsequent*

*License Renewal* at xxvii (NUREG-2191, 2017) ("*2017 Generic Aging Lessons*

*Learned Report*") (JA_) contains some measures for addressing the safety of

reactor operation after 60 years. NRC Br. 43. By its own terms, this guidance

document is not binding. *See* Pet. Br. 42 n.16. Moreover, NRC identifies no

language in the report that purports to resolve the uncertainties and unknowns

identified in NRC Memorandum SECY-2014-0016 and the *NRC-DOE*

*Degradation Assessment*.

Nor is NRC excused from its NEPA obligations by foisting responsibility

for addressing long-term aging effects on accident risk onto the regulated industry

or the public. *See 2017 Generic Aging Lessons Learned Report,* at xxvii (JA_)

(asserting that "it is the *industry's responsibility* to resolve these and other issues

and to provide the technical bases to ensure safe reactor operation beyond 60

years") (emphasis added); NRC Br. 44 (asserting that "Petitioners are always free"

to request license renewal hearings under 10 C.F.R. § 2.309 or enforcement action

under 10 C.F.R. § 2.206). It is NRC's job —not the job of the regulated industry or

the public —to regulate nuclear reactors in conformance with NEPA and the

11

Atomic Energy Act. *See Dep't of Transp. v. Public Citizen,* 541 U.S. 752, 764 (2004) (citing *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 553 (1978) ("[T]he agency bears primary responsibility to ensure that it complies with NEPA.")). Further, NRC's suggestion that Petitioners could effectively use the agency's "public process" resolve their concerns about accident risks created by the unknowns and uncertainties of long-term reactor operation has a hollow ring, given the fact that NRC has no relevant regulations resolving those concerns that members of the public could seek to enforce in such proceedings.

Thus, having chosen not to promulgate new regulations to resolve the unknowns and uncertainties found to be uniquely related to long-term operation with aging reactor safety components, NRC had no lawful grounds to rely on expected future regulatory compliance with non-existent requirements as a means of satisfying NEPA.[4]

---

[4] NRC mischaracterizes Petitioners' argument as an attempt to use this proceeding to air past "grievances" with the adequacy of NRC safety regulations. NRC Br. 30-31. *See also* Int. Br. 3 (calling Petitioners' brief a "collateral attack on NRC's broader safety review process"). Petitioners seek only to enforce NEPA's requirement that if NRC fails to resolve acknowledged safety concerns with regulations, NRC must address risks and uncertainties created by those concerns before making licensing decisions. *See supra* p. 8.

## 2. Standing alone, ongoing oversight during renewed operation does not satisfy NEPA.

NRC argues that in seeking a discussion of the effects on accident risk of long-term aging of safety components (*i.e.,* between 60 and 80 years of operation), Petitioners "ignore[] the agency's ongoing oversight of plant operations and its reasonable expectation and assumption that the agency will respond—and power plant licensees will comply—as appropriate, with regulatory action undertaken to ensure that the risk of a serious accident is minimized." NRC Br. 2. As this Court has held, however, a general assertion that the agency is "on duty" is "in no way sufficient to support a scientific finding that [the proposed action] will not cause a significant environmental impact" during the "extended" period of operation. *New York I*, 681 F.3d at 481. Here, the 2024 GEIS presents no such finding with respect to the effects of aging on accident risk during a second license renewal term. The argument thus fails as a matter of law.[5]

_____

[5] NRC incorrectly argues that *New York I* does not apply here because in that case NRC "eschew[ed] preparation of an [environmental impact statement ("EIS")] altogether" and in this case NRC has already prepared "a full EIS." NRC Br. 39. *New York I*, however, did not turn on whether the NRC must prepare a full EIS, but on NEPA's requirement to consider reasonably foreseeable environmental impacts. 681 F.3d at 478–79. The Court held that an environmental assessment would suffice if the impacts were insignificant. *Id. New York I* applies here because the 2024 GEIS contains no evaluation at all of the effects of long-term aging of safety components and climate change on reactor accident risk.

Contrary to NRC's argument, NRC Br. 36, courts have not held that mere ongoing regulatory oversight, standing alone, satisfies NEPA. In *New York v. NRC*, 824 F.3d 1012, 1021 (D.C. Cir. 2016) ("*New York II*"), the Court upheld NRC's analysis only after finding that the agency had conducted a detailed evaluation of short-term, high-volume spent fuel pool leaks, incorporating both historical evidence and predictive modeling. Regulatory oversight was referenced *in addition* to —not in lieu of —this substantive analysis. In fact, the Court had earlier vacated NRC's prior Waste Confidence rule precisely because it relied only on assurances of future regulatory attention without undertaking any NEPA analysis at all. *See New York I,* 681 F.3d at 478–79.

**3. NRC precedent precludes it from treating the 2024 GEIS as a mere "update" to the 1996 License Renewal GEIS because the 1996 GEIS covered only initial license renewal and did not consider the environmental impacts of subsequent license renewal.**

In defense of its failure to explicitly address the effects of aging safety components on accident risk during the subsequent license renewal term, NRC asserts that it "reasonably relied" on "existing (though updated) data to project likely consequences of severe accidents." NRC Br. 47. *See also* NRC Br. 33 (asserting that the GEIS considered whether any "new information" emerged that would change its previous analysis of severe accident risks for initial license renewal in the 1996 License Renewal GEIS.").

14

By treating the 2024 GEIS as a mere update to the 1996 GEIS for initial

license renewal, NRC violates its own rulings that the 1996 GEIS (and its 2013

revision) are adequate to support *only initial license renewal*, *i.e.,* re-licensing of

reactors for up to 60 years of operation. *See Fla. Power & Light Co.,* 95 N.R.C. 26,

35-36 (2022); *Duke Energy Carolinas, LLC, et al.,* 95 N.R.C. 40, 41 (2022). In

those decisions, the Commission explicitly rejected the Staff's reliance on the 1996

GEIS and 2013 revision for *subsequent* license renewal, *i.e.,* re-licensing of

reactors for more than 60 years and as much as 80 years of operation. 95 N.R.C. at

35-36; 95 N.R.C. at 41. Thus, by merely polishing-up the 1996 License Renewal

GEIS for the purpose of addressing the environmental impacts of subsequent

license renewal, NRC violated the agency's own administrative decisions.

Similarly, NRC errs in relying exclusively on its many years of experience

under original 40-year operating licenses and operating licenses renewed for an

initial license renewal term of up to 60 years to address unknowns and

uncertainties unique to a second license renewal term. NRC Br. 33 and n.11.[6] By

---

[6] NRC also misleadingly implies that it has experience with subsequent license
renewal, by claiming to have "renewed, either for an initial renewal term or a
subsequent one, 85 power reactor licenses." NRC Br. 5 (citing the NRC Digest,
https://www.nrc.gov/docs/ML2505/ML25051A094.pdf (last visited May 26,
2025)). However, NRC has approved only four subsequent license renewal
applications. For those plants, renewed operating license terms will not begin until
2032-2040. *See Status of Subsequent License Renewal Applications, U.S. N.R.C.,*

its own terms, such past experience may not be automatically "updated" or otherwise extrapolated to 80 years of operation without additional consideration of the unique behavior of reactor safety equipment during that second license renewal period. *See* discussion, *supra,* at 7-8 and Pet. Br. 13–15 (citing NRC Memorandum 14-0016 and the *NRC-DOE Degradation Assessment*). *See also New York I,* 681 F.3d at 481 ("[T]he harm from past [spent fuel pool] leaks tells us very little about the potential for future leaks or the harm such leaks might portend. . . . A study of the impact of thirty additional years [of licensed activity] must actually concern itself with the extra years.").

### C. NRC's Vague Assertions That the GEIS Considered the Effects of Aging Reactor Components on Accident Risk During the Subsequent License Renewal Term Violates the NEPA "Hard Look" Standard.

### D.

NRC vaguely asserts it undertook "thorough consideration of the possible contribution of aging components to severe accident risks," NRC Br. 35, yet cites no actual text in the 2024 GEIS to support that claim; nor can any be found. In fact, any such citation would directly contradict the GEIS itself, which explicitly and repeatedly states that the effects of aging were "outside the scope" of NRC's NEPA review and therefore were not analyzed. *Id*. at A-211, A-212 (JA__, __).

---

*https://www.nrc.gov/reactors/operating/licensing/renewal/subsequent-license-renewal.html#completed* (last visited May 26, 2025).

Given that NRC's claim to have considered the effects of long-term aging on accident risk is "'far from self-evidently true," NRC's "bald assertion" on appeal is insufficient to satisfy NEPA's "hard look" standard. *Public Citizen,* 848 F.2d at 267.

Contrary to NRC's assertion, NRC Br. 25, Petitioners do not demand that NRC quantitatively model the effects of aging in a second license renewal term, but they do demand that NRC meaningfully *consider* those effects. *See* Mitman Report at 10 (JA_) (challenging the Draft GEIS for "ignoring the impact of aging on failure rates."). The determination of how to address the impact of aging on failure rates lay within NRC's sole responsibility, *see Baltimore Gas and Elec. Co.,* 462 U.S. at 103, and NRC regulations explicitly allowed it to perform qualitative analyses "to the extent that there are important qualitative considerations or factors that cannot be quantified." 10 C.F.R. § 51.71(d). *See also New York II,* 824 F.3d at 1020 (approving a qualitative environmental impact evaluation).[7]

---

[7] NRC also mischaracterizes Petitioners as demanding that the agency "model worst-case scenarios" and quantify risks that do not affect the agency's overall characterization of the probability-weighted impact of accidents." NRC Br. 25.  To the contrary, Petitioners seek consideration of the reasonably foreseeable environmental impacts identified by NRC in NRC Memorandum SECY-2014-0016 and the *NRC-DOE Degradation Assessment*. If these issues were significant enough to cause NRC to consider amendments to its safety regulations, they cannot be credibly characterized as "worst-case" or insignificant enough to warrant a

Finally, if NRC believed the reasonably foreseeable effects of aging safety equipment on accident risk during a second license renewal term were not significant enough to affect its risk analysis, NEPA obligated the agency to disclose and offer that determination for public comment. NRC was not entitled to declare such a determination as a foregone conclusion without public scrutiny or informed debate. *Dep't of Transp.,* 541 U.S. at 768 (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) (noting that one of NEPA's key purposes is to "ensure that the 'larger audience' . . . can provide input as necessary to the agency in making the relevant decisions.").

### III.    NRC VIOLATED NEPA BY FAILING TO CONSIDER THE EFFECTS OF CLIMATE CHANGE DURING BOTH INITIAL LICENSE RENEWAL AND SECOND LICENSE RENEWAL TERMS.

#### A. NRC's Claim That It Is Incapable of Assessing the Effects of Climate Change on Accident Risk is Not Plausible.

NRC states that it did not try to "forecast" climate change trends with respect to accident risk because they are too "quickly developing" and "subject to revision." NRC Br. 47. This statement suggests that NRC ruled out consideration of climate change effects on accident risk because it considered them to be speculative. If correct, such a claim would be untenable and contrary to established

---

summary determination that they will have no effect on NRC's finding of no significant impact. *See supra* p. 7–8.

scientific and regulatory understanding. NRC acknowledges as a general matter that climate change is reasonably foreseeable, and indeed the GEIS contains extensive predictions of climate change's effects on "environmental resources." *Id.* at G-32 – G-36 (JA_). On appeal, NRC also claims expertise in assessing the effects of external factors such as floods, hurricanes and fires on accident risk. *See, e.g.,* NRC Br. 20–21, 46, 49-50. Therefore, NRC's suggestion that it is incapable of conducting an environmental analysis of how climate change could affect accident risk is simply implausible. Because NRC failed to rule out the effects of climate change on accident risk as speculative, NEPA required that those impacts must be addressed in the GEIS. *New York I,* 681 F.3d at 478–79.

### B. NRC Fails to Support its Alternative Claim That It Considered the Effects of Climate Change on Accident Risk.

In the alternative, NRC concedes that the effects of climate change on reactor accident risk are reasonably foreseeable and claims that it did, in fact, consider those environmental impacts. NRC Br. 26. According to NRC, it determined that the likelihood of severe accidents is so low, and attended by such a great margin of error, that no plausible effect of climate change could "meaningfully" change NRC's conclusion that severe accident impacts are low. NRC Br. 51. These assertions fail to satisfy NEPA.

19

### 1.  The record does not support NRC's assertion.

At the outset, it defies logic for NRC to suggest on appeal that it meaningfully analyzed climate-related risks in its environmental review while the GEIS disclaimed those risks as beyond the scope of that review. Moreover, the record below reflects no such consideration, notwithstanding NRC's misleading implication that it actually modeled climate change effects and then determined that "*further modeling* of the impacts of climate change on severe accident risk and "*additional consideration* of climate change impacts on severe accidents" were unwarranted. NRC Br. 55 (emphasis added) (citing 2024 GEIS at A-222 (JA_)). Nowhere does the 2024 GEIS state that NRC conducted *any* modeling of climate change impacts in its severe accident analysis, let alone "further" or "additional" modeling. Instead, without a scientific basis, NRC claims to have lumped climate change with "a variety of uncertainties" and "imperfectly quantified factors" that were purportedly embraced by the "large safety margin" in its risk analysis.[8]

---

[8] The myriad "updates" to the 1996 GEIS referred to by NRC, *see, e.g.,* NRC Br. 26, 30, 47, 54, are unavailing. The 1996 GEIS and the 2013 update considered only the historical record of external events, not the unique characteristics of climate change. *See* NRC Br. 47 (asserting that the GEIS relied on "existing (though updated) data to project likely consequences of severe accidents.") *See also* Pet. Br. 48. NRC provides no evidence that the 2024 GEIS did anything more than revise this historical data.

Therefore, NRC's brief fails to satisfy the "hard look" standard. *N.J. Conservation Found.*, 111 F.4th at 54. Further, as discussed, *supra p.* 8, generally pointing to a purportedly "conservative methodology for addressing uncertainty" does not amount to the "careful consideration and disclosure" required by *Baltimore Gas & Elec. Co.* 462 U.S. at 98.

### 2. NRC's legal rationales for its asserted determination of no significant impact are erroneous.

Nor is NRC saved by its claim to be prepared for climate-related challenges through its general oversight of reactor safety. NRC Br. 48. A general assertion that an agency is "on duty" is "in no way sufficient to support a scientific finding" regarding the prospective environmental impacts of a proposed action. *New York I*, 681 F.3d at 481. *See also* Pet. Br. 53 and *supra p.* 13-14. NRC's reliance on the fact that it "continually evaluates nuclear power plant operating conditions and physical infrastructure" and has "broad authority to take appropriate action to ensure safety," NRC Br. 48, runs directly afoul of NEPA's requirement that agencies must consider environmental risks *before* making decisions, not in hindsight. *See* Pet. Br. 43 n.17 (citing *New York I*, 681 F.3d at 481) (rejecting claims to "improvements" that "are thus far untested"); *Robertson*, 490 U.S. at 349 (noting that "NEPA ensures that important effects will not be overlooked or

underestimated only to be discovered after resources have been committed or the die otherwise cast.")).

Further, NRC has no safety regulations that require protection of nuclear reactors against the effects of climate change. While NRC claims to have "mechanisms for the agency to learn about changing conditions that may pose safety risks," NRC Br. 48, it fails to identify any "mechanisms" for applying or enforcing what is learned. Without clear standards or mandatory enforcement, NRC's assurance is unsubstantiated and ultimately, meaningless in ensuring public safety or environmental protection.

NRC also argues that its re-evaluations of seismic and flooding hazards after the 2011 Fukushima disaster, combined with "other" post-Fukushima "actions," have "further improved plant safety and provided a basis for the agency to conclude that its regulatory processes will minimize the impacts of any climate-change related accidents in the future." NRC Br. 49–50. *See also* Int. Br. 36 ("NRC already considered updated data on external event risks and accident consequences – and still concluded that the probability-weighted impacts of severe accidents have significantly decreased."). But NRC's assertion that the review "improved plant safety" is far from a claim to a systematic environmental impact review.

Additionally, in claiming that its post-Fukushima review and "actions" have "improved plant safety," NRC fails to acknowledge that "to a significant extent,"

22

its post-Fukushima orders requiring improvements to safety were later "replaced by regulations that render key aspects of the mitigation measures unenforceable and subject only to the unilateral decisions of the licensees as to whether to maintain them." Mitman Report at 4-5 (JA_). *See also* Mitman Detailed Comments at 3, item 11 (JA_); 4, item 12 (JA_); 11, item 34 (JA_).

Ultimately, neither NRC nor Intervenors provides any evidence that the post-Fukushima reviews considered anything but historical input. The record contains no evidence that NRC considered the rapidly growing frequency and increased intensity of climate change effects. To the contrary, NRC's brief on appeal states that climate change is too "fast-moving" to forecast. NRC Br. 50. Such internal inconsistency destroys the credibility of NRC's and Intervenors' claims.

### C. NRC's Other Rationalizations for Failing to Evaluate the Effects of Climate Change are Arbitrary and Capricious.

Finally, NRC attempts to defend itself by falsely accusing Petitioners of making unreasonable demands in their comments. According to NRC, Petitioners "would task the agency with developing an entirely new evaluation methodology to evaluate severe accidents." NRC Br. 38 (citing *Town of Winthrop v. FAA*, 535 F.3d 1, 12–13 (1st Cir. 2008)). NRC asserts that Petitioners have asked them to "identify with mathematic precision how future climate-related changes . . . might

23

affect the likelihood of an accident." NRC Br. 47.[9] Petitioners have not sought to prescribe the way NRC should consider the effects of climate change on accident risk, nor would it be appropriate. *See supra* p.17. Petitioners merely urge NRC to apply existing tools and data to account for climate change; a basic step consistent with NEPA's requirements.

For example, NRC has the discretion to perform a quantitative or qualitative analysis. 10 C.F.R. § 51.71(d). While NRC has discretion on how to perform the analysis, it does not have discretion to utterly refuse the analysis altogether. And in light of two critical facts that (a) the GEIS has already made a region-by-region evaluation of climate change's effects on "resources," *see* 2024 GEIS at G-32 – G-36 (JA_ - _), and (b) NRC has significant experience evaluating the environmental impacts of external events, *see* NRC Br. 48, it is hardly unreasonable to expect NRC to forecast the effects of climate change on accident risk.

---

[9] In this vein, NRC cites the 150-page limit on most EISs imposed by the Fiscal Responsibility Act of 2023. *Id*. However, nothing in the Fiscal Responsibility Act weakens NEPA's procedural requirements or dilutes the federal courts' long-established "hard look" standard.

**IV.  NRC'S CLAIM THAT THE EFFECTS OF CLIMATE CHANGE ON ACCIDENT CAN BE ADDRESSED BY A GENERIC FINDING OF NO SIGNIFICANT IMPACT IS CONTRADICTED BY THE AGENCY'S DETERMINATION THAT CLIMATE CHANGE IMPACTS ARE SITE-SPECIFIC.**

On appeal, NRC makes the sweeping assertion that climate change "will not meaningfully alter any particular plant's risk profile." NRC Br. 51. Setting aside the fact that the record contains no support for this claim to have reached a generic conclusion about climate change effects on accident risk based on an examination of every reactor site and nuclear plant in the U.S, *see supra p.* 19–20, the claim fails to satisfy NEPA because it is fundamentally "undermine[d]" by the 2024 GEIS' determination that the environmental impacts of climate change are inherently regional and local and therefore not subject to generalization or codification in binding generic (*i.e.,* Category 1) findings. *New York II,* 824 F.3d at 1020. As stated in the GEIS:

> The NRC has concluded that the effects of climate change can vary regionally, and climate change information at the regional and local scale is necessary to assess trends and the impacts on the human environment for a specific location. Therefore, for the new Category 2 issue, the impacts of climate change on environmental resources that are affected by continued nuclear powerplant operations and refurbishment during the license renewal term are location-specific, thus requiring a plant-specific review.

2024 GEIS at A-260 – A-261 (JA_ - __). *See also* Petitioners' Comments (Mitman Technical Report at 8-9 (JA_), Mitman Detailed Comments at 6 (JA_).

25

NRC's argument that climate change-related accident risks can be generalized defies logic considering the agency's determination in the 2024 GEIS that climate change effects are inherently regional and local. Thus, it utterly fails to satisfy the "hard look" test. *See N.J. Conservation Found.*, 111 F.4th at 54. It is also unsupported by the "thorough and comprehensive analysis" required by NEPA. *New York II,* 824 F.3d at 1020 (quoting *New York I,* 681 F.3d at 481).[10]

NRC's failure to justify its generic disposition of climate change's effects on accident risk also fatally undermines its binding generic determination not to consider alternatives for the mitigation of those impacts for any individual reactor. If the environmental effects of climate change on accident risk are significant for any individual reactor, then it logically follows site-specific consideration of mitigation alternatives will be required. *See Van Ee v. EPA,* 202 F.3d 296, 309 (D.C. Cir. 2000) (noting that NEPA's requirement to "rigorously explore and

---

[10] NRC asserts that the recently-passed ADVANCE Act encourages NRC to use generic environmental impact statements to facilitate efficiency. NRC Br. 9 (citing Section 506 of the Accelerating Deployment of Versatile, Advanced Nuclear for Clean Energy (ADVANCE) Act.) *See also* Int. Br. 41. But NRC does not cite to any provision in that statute revoking or otherwise weakening NEPA's requirement that environmental impact findings made generically must be supported by a "thorough and comprehensive analysis." *New York II,* 824 F.3d at 1020.

objectively evaluate the projected environmental impacts of all reasonable alternatives for completing the proposed action" lies at the "heart" of an EIS.).[11]

## V.    THE COURT SHOULD VACATE ALL PARTS OF THE FINAL RULE AND THE GEIS.

NRC does not directly respond to Petitioners' request that the Court vacate the Rule. *See* Pet. Br. 58. But it does request that if the Court reverses the Final Rule, it should leave intact the 79 other environmental impact findings in the 2024 GEIS because each of those findings "stands on its own." NRC Br. 64 n.17. Petitioners respectfully submit that it is premature for the Court to rule on the viability of the other 79 findings. Given the concededly fundamental importance of aging and changing environmental conditions to NRC's license renewal rule, *see* Pet. Br. 3, the Final Rule should be vacated, and NRC should be precluded from relying on the 2024 GEIS unless and until NRC has provided a complete environmental analysis in a revised GEIS. These curative measures should include circulating a draft for public comment on all relevant issues, including whether any

---

[11] NRC and Intervenors err in claiming that Petitioners failed to raise this issue below. NRC Br. 63, Int. Br. 40. *See* Petitioners' Comments at 5 (JA_) and Mitman Report at 9 (JA_) (asserting that consideration of climate change effects on accident risk "would provide important information regarding climate-related accident risk as well as identification of mitigation measures to address those risks"); Mitman Report at 9 (JA_) (noting that "climate change can increase the probability of failure of design features or mitigation equipment").

of the 79 other findings are affected by NRC's new analyses and conclusions regarding aging and climate change-related issues.

## VI.    CONCLUSION

For the foregoing reasons, the Court should vacate the Final Rule and remand the Rule and the 2024 GEIS to NRC to review of the effects of aging safety equipment and climate change on reactor accident risks, including measures to avoid or mitigate those risks.

Respectfully submitted,

\_\_\_/signed electronically by/\_\_
Diane Curran
Harmon, Curran, Spielberg, & Eisenberg, L.L.P.
1725 DeSales Street N.W., Suite 500
Washington, D.C. 20036
240-393-9285
Email: dcurran@harmoncurran.com


\_\_\_/signed electronically by/\_\_
Caroline Leary
Environmental Working Group
1250 I St N.W., Suite 1000
Washington, DC 20005
202-667-6982
cleary@ewg.org

Counsel for Petitioners

May 27, 2025

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure Rule 32(a)(7)(C) and

Circuit Rule 32(a)(2)(C), I certify that the attached Initial Reply Brief is

proportionately spaced, has a typeface of Times New Roman, 14 points, and

contains 6,479 words. This figure includes footnotes and citations, but excludes the

Cover Page, Table of Contents, Table of Authorities, signature blocks, Certificate

of Compliance, Certificate as to Parties, Rulings, and Related Cases, Addendum of

Statutes, Rules, and Regulations, and Standing Addendum. I have relied on

Microsoft Word's calculation feature for this calculation.

___/signed electronically by/__
Diane Curran
Harmon, Curran, Spielberg, & Eisenberg, L.L.P.
1725 DeSales Street N.W., Suite 500
Washington, D.C. 20036
240-393-9285
Email: dcurran@harmoncurran.com

May 27, 2025