**NOT YET SCHEDULED FOR ORAL ARGUM91ENT**
No. 24-1318

_____

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

BEYOND NUCLEAR, INC. and THE SIERRA CLUB, INC.,
*Petitioners*,
v.
UNITES STATES NUCLEAR REGULATORY COMMISSION
and the UNITED STATES OF AMERICA,
*Respondents*,

NUCLEAR ENERGY INSTITUTE, *et al.*
*Intervenors*.

_____

On Petition for Review of an Order of the
United States Nuclear Regulatory Commission

_____

**FINAL BRIEF FOR FEDERAL RESPONDENTS**

_____

BROOKE P. CLARK
*General Counsel*
ANDREW P. AVERBACH
*Solicitor*
MAXWELL C. SMITH
*Senior Attorney*
U.S. Nuclear Regulatory
Commission
11555 Rockville Pike
Rockville, MD 20852
(301) 415-1956
andrew.averbach@nrc.gov

ADAM R.F. GUSTAFSON
*Acting Assistant Attorney General*
CHRISTOPHER ANDERSON
*Attorney*
Environment and Natural Resources
Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 353-1834
christopher.anderson3@usdoj.gov

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.    Parties and Amici

Except for Miami Waterkeeper, which was granted leave to file a brief as amicus curiae on March 12, 2025, all parties, intervenors, and amici appearing in this Court are listed in Petitioners' Initial Opening Brief.

### B.    Rulings Under Review

The ruling under review is identified in Petitioners' Initial Opening Brief.

### C.    Related Cases

There are no related cases within the meaning of Circuit Rule 28(a)(1)(C).

/s/ *Andrew P. Averbach*
Andrew P. Averbach

Counsel for U.S. Nuclear
Regulatory Commission

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND
     RELATED CASES .................................................................i

TABLE OF AUTHORITIES.................................................iv

GLOSSARY .........................................................................ix

INTRODUCTION.................................................................1

STATEMENT OF JURISDICTION ......................................3

STATEMENT OF THE ISSUES.............................................3

PERTINENT STATUTES AND REGULATIONS ..................4

STATEMENT OF THE CASE ...............................................5

    A.    Statutory and regulatory background ...................5

        1.    Scope of NRC Review of Applications for
            Power Plant License Renewal ......................5

        2.    Agency Obligations Under the National
            Environmental Policy Act ............................7

            a.    General Principles Governing Major
                Federal Actions Undertaken by the
                NRC ....................................................7

            b.    The NRC's Determination that
                Certain Impacts Related to License
                Renewal Can Be Assessed Generically ..............10

    B.    Factual background .............................................12

SUMMARY OF ARGUMENT ................................................25

STANDARD OF REVIEW......................................................28

ARGUMENT ........................................................................ 30

I.   Further Consideration of Aging Management Would
     Not Change the Conclusion in the Generic EIS that the
     Impacts of Severe Accidents Are Small. ........................ 32

     A.   The NRC Reasonably Presumed Compliance with
          Its Regulations in Analyzing Severe Accidents
          under the Generic EIS. .......................................... 32

     B.   The NRC's Underlying Safety Review of Aging
          Management Is Not Before the Court. ................. 39

II.  The NRC Reasonably Accounted for Any Effects of
     Climate Change in Performing Its Severe Accident
     Analysis. ....................................................................... 44

     A.   The NRC's Reliance on Its Regulatory Processes
          Complies with NEPA's Rule of Reason. ............... 44

     B.   Petitioners Have Not Demonstrated that Further
          Consideration of Climate Change Would
          Materially Alter the NRC's Evaluation of Severe
          Accidents. ............................................................. 54

III. Petitioners Never Raised the Arguments They Present
     to the Court Concerning the Rule's Generic Resolution
     of Severe Accident Mitigation Measures, Which Are in
     Any Event Supported by Circuit Precedent and the
     Agency's Technical Analysis. ....................................... 59

CONCLUSION ................................................................... 65

CERTIFICATE OF COMPLIANCE ....................................... 66

# TABLE OF AUTHORITIES*

## Cases

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.,*
    462 U.S. 87 (1983) ........................................................................ 35

*Blue Ridge Envtl. Def. League v. NRC,*
    716 F.3d 183 (D.C. Cir. 2013) ...................................................... 29

*City of Carmel-by-the-Sea v. Dep't of Transp.,*
    123 F.3d 1142 (9th Cir. 1997) ................................................ 37, 50

*CTIA-Wireless Ass'n v. FCC,*
    466 F.3d 105 (D.C. Cir. 2006) ...................................................... 28

***Department of Transp. v. Public Citizen,*
    541 U.S. 752 (2004) ............................................................ 8, 35, 62

*Dickinson v. Zurko,*
    527 U.S. 150 (1999) ...................................................................... 28

***Duncan's Point Lot Owners Ass'n v. FERC,*
    522 F.3d 371 (D.C. Cir. 2008) .................................................. 29, 35

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ...................................................................... 28

*Indian River Cty. v. Dept of Transp.,*
    945 F.3d 515 (D.C. Cir. 2019) ...................................................... 29

*Laguna Greenbelt, Inc. v. Dep't of Transp.,*
    42 F.3d 517 (9th Cir. 1994) .......................................................... 47

*Limerick Ecology Action, Inc. v. NRC,*
    869 F.2d 719 (3d Cir. 1989) .................................................... 32, 33

---

* Authorities upon which we chiefly rely are marked with asterisks.

*Marsh v. Or. Nat. Res. Council*,
490 U.S. 360 (1989) ................................................................ 29, 51

*Nasdaq Stock Mkt. LLC. v. SEC*,
38 F.4th 1126 (D.C. Cir. 2022) ....................................................... 65

*\*Nat. Res. Def. Council v. NRC*,
823 F.3d 641 (D.C. Cir. 2016)............................................. 17, 61, 63

*New Jersey Conservation Found. v. FERC*,
111 F.4th 42 (D.C. Cir. 2024) ....................................................... 45

*New York v. NRC*,
681 F.3d 471 (D.C. Cir. 2012)................................................. 38, 39

*\*New York v. NRC*,
824 F.3d 1012 (D.C. Cir. 2016)................................... 11, 36, 50, 51

*Public Citizen v. Nat'l Highway Traffic Safety Admin.*,
848 F.2d 256 (D.C. Cir. 1988).................................................. 36, 50

*\*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989) ........................................... 8, 36, 57, 59, 63, 64

*Sierra Club v. FERC*,
827 F.3d 36 (2016) ....................................................................... 56

*Town of Winthrop v. FAA.*,
535 F.3d 1 (1st Cir. 2008)......................................................... 38, 50

*Transcon. Gas Pipe Line Corp. v. FERC*,
518 F.3d 916 (D.C. Cir. 2008)........................................................ 28

*WildEarth Guardians v. Jewell*,
738 F.3d 298 (D.C. Cir. 2013)........................................................ 29

# Statutes and Regulations

5 U.S.C. § 706 ...................................................................... 28

28 U.S.C. § 2342 .................................................................. 27

42 U.S.C. § 2133 .................................................................... 5

42 U.S.C. § 2239 ............................................................... 3, 28

42 U.S.C. § 4332 ............................................................... 8, 59

42 U.S.C. § 4336a .................................................................. 9

10 C.F.R. § 2.202 ................................................................. 48

10 C.F.R. § 2.206 ................................................................. 44

10 C.F.R. § 2.309 ................................................................. 44

10 C.F.R. § 2.335 ................................................................. 11

10 C.F.R. § 2.801 ................................................................. 48

10 C.F.R. § 50.65 ................................................................. 22

10 C.F.R. § 51.53 ................................................................. 11

10 C.F.R. § 51.95 ............................................................. 8, 11

10 C.F.R. § 54.29 ............................................................. 6, 23

10 C.F.R. § 54.31 .................................................................. 5

10 C.F.R. § 54.33 ................................................................. 34

## Decisions of the Nuclear Regulatory Commission

*In the Matter of Florida Power & Light Co.*,
  54 N.R.C. 3 (2001) ...................................................................... 7, 23

*In the Matter of NextEra Energy Point Beach, LLC*,
  95 N.R.C. 97 (2022) .................................................................... 6, 7

## Federal Register Notices

Final Rule, Reduction of Risk from Anticipated Transients
  Without Scram (ATWS) Events for Light-Water-Cooled
  Nuclear Power Plants,
  49 Fed. Reg. 26,036 (June 26, 1984) .............................................. 33

Final Rule, Station Blackout,
  53 Fed. Reg. 23,203 (June 21, 1988) .............................................. 33

Final Rule, Nuclear Power Plant License Renewal,
  56 Fed. Reg. 64,943 (Dec. 13, 1991) ......................................... 5, 23

Final Rule, Nuclear Power Plant License Renewal;
  Revisions,
   60 Fed. Reg. 22,461 (May 8, 1995) ................................................ 22

Final Rule, Environmental Review for Renewal of Nuclear
  Power Plant Operating Licenses,
  61 Fed. Reg. 28,467 (June 5, 1996) ................................................ 10

Final Rule, Monitoring the Effectiveness of Maintenance at
  Nuclear Power Plants,
  64 Fed. Reg. 38,551 (July 19, 1999) ............................................... 33

Final Rule, Power Reactor Security Requirements,
  74 Fed. Reg. 13,926 (Mar. 27, 2009) .............................................. 33

Final Rule, Consideration of Aircraft Impacts for New
  Nuclear Reactors, 74 Fed. Reg. 28,112 (June 12, 2009) ............... 33

Final Rule, Revisions to Environmental Review for Renewal
  of Nuclear Power Plant Operating Licenses,
  78 Fed. Reg. 37,282 (June 20, 2013) ....................................... 11, 17

Final Rule, Mitigation of Beyond-Design-Basis Events,
  84 Fed. Reg. 39,684 (Aug. 9, 2019) ................................................ 33

Final Rule and Guidance; Issuance, Reviewing Nuclear
  Power Plant Operating Licenses–Environmental
  Review,
  89 Fed. Reg. 64,166 (Aug. 6, 2024) .......................................... 12, 60

## Other Authorities

NUREG-1350, Volume 35, *Information Digest, 2024-25* at
  32-34, *available at* https://www.nrc.gov/docs/ML2505/
  ML25051A094.pdf (last visited April 21, 2025).............................5

# GLOSSARY

| | |
|---|---|
| AEA | Atomic Energy Act of 1954 |
| EIS | Environmental Impact Statement |
| NEPA | National Environmental Protection Act |
| NRC | U.S. Nuclear Regulatory Commission |

## INTRODUCTION

This Petition for Review challenges a final order (the "Rule") entered in a rulemaking proceeding conducted by the U.S. Nuclear Regulatory Commission ("NRC" or the "Commission"). The Rule codifies, for purposes of the National Environmental Policy Act ("NEPA"), the impacts identified in NUREG-1437, Revision 2, NRC's Generic Environmental Impact Statement for License Renewal of Nuclear Plants ("Generic EIS"), as the generic impacts from nuclear power plant operations traceable to NRC decisions to renew licenses for nuclear power plants.

Petitioners challenge the legal and factual support underpinning the NRC's conclusions in the Generic EIS and their codification in the Rule. But their arguments fail largely because they misapprehend the nature and scope of the NRC's regulatory processes. The decision whether to renew a power plant license focuses on managing the effects of aging equipment; under the NRC's regulations, each license renewal applicant must demonstrate that the effects of aging will be adequately managed. By contrast, the day-to-day safety of the plant—including its susceptibility to external events such as terrorist attacks, seismic

events, and natural disasters—is assessed on an ongoing basis through the agency's rigorous inspection, maintenance, and oversight programs.

The NRC's identification of the environmental impacts germane to its decision to renew the license of a nuclear power plant is a function of the range of information that is relevant to the agency's determination and NEPA's rule of reason. Contrary to Petitioners' view, the agency has assessed in the Rule and the Generic EIS the reasonably foreseeable impacts of aging and of the risks of an accident, including any accident scenarios that, in the NRC's expert judgment, can be reasonably anticipated. Petitioners' various demands that the agency speculate further about what might happen in the future, and about how potential accidents might be affected by aging equipment or future climate-related events, ignores the agency's ongoing oversight of plant operations and its reasonable expectation and assumption that the agency will respond—and power plant licensees will comply—as appropriate, with regulatory action undertaken to ensure that the risk of a serious accident is minimized. The NRC's comprehensive analysis in its Generic EIS satisfies NEPA's requirements.

## STATEMENT OF JURISDICTION

The Rule and the impacts in the Generic EIS codified in the Rule are subject to judicial review because the Rule constitutes a "final order" in a rulemaking proceeding under Section 189.a(1)(A) of the Atomic Energy Act ("AEA"), 42 U.S.C. § 2239(a)(1)(A). Such final orders trigger Hobbs Act jurisdiction under 28 U.S.C. § 2342 and 42 U.S.C. § 2239(b)(1). The Petition for Review was timely filed within sixty days of the Rule's publication on August 6, 2024. *See* 28 U.S.C. § 2344; Fed. R. App. P. 26(a)(1)(C).

## STATEMENT OF THE ISSUES

1.      Whether, in identifying on a generic basis the environmental effects of reactor operations during periods of license renewal, the NRC reasonably determined that the anticipated effects of aging components on severe accident risk is sufficiently low in light of the NRC's stringent safety review during license renewal and its ongoing regulatory oversight that more detailed analysis of those effects would not alter the agency's conclusion that the probability-weighted environmental impacts from severe accidents are small.

2.      Whether the NRC reasonably allowed for the possible effects of climate change on its accident analysis by relying on current information demonstrating high margins undergirding its accident analysis and the agency's ongoing consideration of evolving external hazards in concluding that the probability-weighted environmental impacts from severe accidents are small.

3.      Whether the agency reasonably determined that power plant licensees that had already conducted an analysis of severe accident mitigation alternatives need not perform another one when they seek to renew the license of an already-constructed facility, where the agency's determination is based on its extensive expertise in conducting such analyses and its conclusion, previously endorsed by this Court, that additional such analyses are not likely to lead to cost-beneficial solutions.

## PERTINENT STATUTES AND REGULATIONS

All pertinent statutes and regulations are set forth in a separately filed Addendum.

## STATEMENT OF THE CASE

### A.    Statutory and regulatory background

### 1.    Scope of NRC Review of Applications for Power Plant License Renewal

The Atomic Energy Act of 1954 ("AEA") authorizes the NRC to issue licenses to operate commercial nuclear power plants for up to 40 years.  *See* 42 U.S.C. § 2133.  The AEA and the NRC's regulations allow for the renewal of these licenses for up to an additional 20 years for each renewal term.  *Id.* § 2133(b); 10 C.F.R. § 54.31(b).  Notably, Congress imposed these time limits because of antitrust concerns, not because of concerns about safety or security or a determination that plants could not operate safely beyond a particular period of time.  *See* Final Rule, Nuclear Power Plant License Renewal, 56 Fed. Reg. 64,943, 64,960-62 (Dec. 13, 1991).  Through the end of 2024, the NRC has renewed, either for an initial renewal term or a subsequent one, 85 power reactor licenses.  *See generally* NUREG-1350, Volume 35, *Information Digest, 2024-25* at 32-34, *available at* https://www.nrc.gov/docs/ML2505/ML25051A094.pdf (last visited April 21, 2025).

The NRC's review of a license renewal application proceeds along two independent regulatory tracks: one for safety issues and another for environmental issues.  The NRC's regulations for the license renewal safety review are set forth in Part 54 of Title 10 of the Code of Federal Regulations, "Requirements for Renewal of Operating Licenses for Nuclear Power Plants."  The NRC's environmental protection regulations are set forth in 10 C.F.R. Part 51, "Environmental Protection Regulations for Domestic Licensing and Related Regulatory Functions."

The NRC's consideration of safety issues related to license renewal is confined to consideration of the effects of aging on plant structures and equipment.  *In the Matter of NextEra Energy Point Beach, LLC*, 95 N.R.C. 97, 101-02 (2022); *see* 10 C.F.R. § 54.29.  The NRC's safety review of a license renewal application does not entail a full reassessment of safety issues previously addressed in the licensing of a plant, nor is it designed to review current operations; rather, it "focuses on those potential detrimental effects of aging that are not routinely addressed by ongoing regulatory oversight programs" and the applicant's plans for managing those effects during the period of

extended operation. *NextEra Energy*, 95 N.R.C. at 101 (quotation marks omitted). "Ongoing operational issues are not reviewed because such issues are 'effectively addressed . . . by ongoing agency oversight, review, and enforcement.'" *Id.* at 101-02; *see also In the Matter of Florida Power & Light Co.*, 54 N.R.C. 3, 8 (2001) (explaining that, in light of its "aggressive" oversight of plant operation, "it would be unnecessary to include in [license renewal] review all those issues already monitored, reviewed, and commonly resolved as needed by ongoing regulatory oversight"). *See generally* https://www.nrc.gov/reactors/operating/oversight.html (last visited April 21, 2025) (describing the NRC's Reactor Oversight Process, the agency's program to inspect, measure, and assess the safety and security performance of operating commercial nuclear power plants, and to respond to any decline in their performance).

## 2. Agency Obligations Under the National Environmental Policy Act

### a. General Principles Governing Major Federal Actions Undertaken by the NRC

As a major federal action, the NRC's renewal of a nuclear power plant operating license also requires the preparation of an EIS to satisfy

7

the agency's obligations under NEPA.  42 U.S.C. § 4332(C); 10 C.F.R.

§ 51.95(c).  The Supreme Court has explained that "NEPA itself does

not mandate particular results, but simply prescribes the necessary

process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332,

350 (1989).  Under this process, "agencies must take a 'hard look' at

environmental consequences." *Id*. (quoting *Kleppe v. Sierra Club*, 427

U.S. 390, 410 n. 21 (1976)).  This review has two purposes: to inform the

decisionmaker and the public. *Id*. 349.  However, provided "the adverse

environmental effects of the proposed action are adequately identified

and evaluated, the agency is not constrained by NEPA from deciding

that other values outweigh the environmental costs." *Id*. at 351.

Importantly, examination of impacts in an EIS must be guided by

a "rule of reason," which "ensures that agencies determine whether and

to what extent to prepare an EIS based on the usefulness of any new

potential information to the decisionmaking process." *Dep't of Transp.*

*v. Public Citizen*, 541 U.S. 752, 767 (2004).  The "rule of reason" is not

satisfied where consideration of a particular environmental harm would

not serve NEPA's goals of providing information to the agency to assist

in its decisional process and to the public to enable it to offer meaningful input. *Id.*

Recent legislation reflects a Congressional expectation that NEPA reviews will be conducted efficiently, both generally and at the NRC. In 2023, Congress amended NEPA for the first time in many years. Fiscal Responsibility Act of 2023, Pub. L. 118-5, 137 Stat 10, § 321 (June 3, 2023). These amendments include a number of provisions designed to accelerate and focus the NEPA process, including new requirements that environmental impact statements generally be completed in two years or less and not exceed 150 pages (or 300 pages for agency action of "extraordinary complexity"). *Id.* § 107, "Timely and Unified Federal Reviews" (codified at 42 U.S.C. § 4336a(e),(g)).

More recently, in 2024, Congress passed legislation specifically directed at the NRC, the Accelerating Deployment of Versatile, Advanced Nuclear for Clean Energy (ADVANCE) Act. Fire Grants & Safety, Advance Act, Pub. L. 118-67, 138 Stat 1447, 1448 (July 9, 2024). Section 506 of the ADVANCE Act requires the Commission to provide a report to Congress "on the efforts of the Commission to facilitate efficient, timely, and predictable environmental reviews of nuclear

reactor applications." Notably, the ADVANCE Act specifically

encourages the Commission to achieve this end through the "expanded

use of . . . generic environmental impact statements." *Id.*

> **b.    The NRC's Determination that Certain
> Impacts Related to License Renewal
> Can Be Assessed Generically**

In 1996, to support the preparation of environmental reviews for

applications, the NRC issued a final rule, Environmental Review for

Renewal of Nuclear Power Plant Operating Licenses, 61 Fed. Reg.

28,467 (June 5, 1996), which was supported by the original version of

the Generic EIS. In that Generic EIS, the NRC determined which

environmental impacts resulting from plant operation would essentially

be the same at all nuclear power plants or a subset of plants

(designating them as "generic" or Category 1 issues), and which impacts

could be different at different plants and would require a plant-specific

analysis (Category 2 issues). *Id.* at 28,474.

The NRC codified the determinations in the Generic EIS in Table

B-1, "Summary of Findings on NEPA Issues for License Renewal of

Nuclear Power Plants," of appendix B to subpart A of 10 C.F.R. Part 51.

Pursuant to Commission rule, those impacts that require a plant-

specific analysis must be analyzed by the applicant in its environmental report and by the NRC in a Supplemental EIS. *See* 10 C.F.R. §§ 51.53(c), 51.95(c). For each application to renew a reactor license, the Generic EIS (which references other generic analyses such as the Commission's Continued Storage Rule, Generic EIS at 2-13 (JA081); *see New York v. NRC*, 824 F.3d 1012, 1017-18 (D.C. Cir. 2016)) and the Supplemental EIS constitute the environmental analysis supporting the NRC's licensing decision.[2]

The NRC updated its 1996 rule in 2013 (*see* Final Rule, Revisions to Environmental Review for Renewal of Nuclear Power Plant Operating Licenses, 78 Fed. Reg. 37,282 (June 20, 2013)) by issuing Revision 1 to the 1996 Generic EIS. The Rule at issue in this Petition for Review, which codifies Revision 2 to the Generic EIS, redefines the number and scope of the environmental issues that must be addressed by the NRC and applicants during license renewal environmental

---

[2] Although it designated Category 1 impacts as common to all plants, the Commission has recognized that, in certain instances, it will be appropriate to waive application of the Rule and consider Category 1 issues on a site-specific basis. Generic EIS at 1-17 (JA072); 10 C.F.R. § 2.335(b); *see also New York*, 824 F.3d at 1021 (describing and upholding the NRC's process for waiver of applicability of generic environmental analyses based on site-specific considerations).

reviews. *See* Final Rule and Guidance; Issuance, Reviewing Nuclear Power Plant Operating Licenses–Environmental Review, 89 Fed. Reg. 64,166, 64,167 (Aug. 6, 2024). These changes are based primarily on the lessons learned and knowledge gained from the review of license renewal applications performed by the NRC since 2013. *Id.* Rather than undertaking an entirely new analysis, Revision 2 to the Generic EIS builds upon the analysis contained in the 1996 Generic EIS and Revision 1 by updating the conclusions of those earlier documents in light of newly available information.

## B.     Factual background

The NRC began preparing Revision 2 to the Generic EIS in August 2020 and embarked upon a public scoping process that year. Generic EIS at xxxii (JA069). It prepared an original and revised rulemaking plan after determining that its analysis should apply both to applications for an initial license renewal period (i.e., for years 41-60 of plant operations) and to a subsequent one (i.e., a term beyond sixty years). *Id.* It issued a proposed rule and draft Generic EIS in March 2023 and, after conducting a series of public meetings and considering and responding to more than 600 unique comments, *id.* at A-2 (JA097),

it issued the Rule and Revision 2 of the supporting Generic EIS in August 2024.

In Revision 2 of the Generic EIS, the NRC identified the environment affected by the renewal of licenses for nuclear power plants across twelve resource or subject-matter areas: (1) description of nuclear power plant facilities and operations; (2) land use and visual resources; (3) meteorology, air quality, and noise; (4) geologic environment; (5) water resources (surface water and groundwater resources); (6) ecological resources (terrestrial resources, aquatic resources, and federally protected ecological resources); (7) historic and cultural resources; (8) socioeconomics; (9) human health (radiological and nonradiological hazards and postulated accidents); (10) environmental justice; (11) waste management and pollution prevention (radioactive and nonradioactive waste); and (12) greenhouse gas emissions and climate change. *Id.* at xxxvi (JA070). Based on extensive analysis, it determined that 59 issues were common to all nuclear power plants and could be evaluated generically, and that twenty would need to be analyzed on a site-specific basis. *Id.* The remaining issue,

electromagnetic fields, is uncategorized pending a scientific consensus.
*Id*. at 2-12 (JA080).

The NRC determined that the issues it designated as Category 1
would have "small" impacts, *id*. at 2-5 to 2-15 (JA073-083), meaning
that they were unlikely either to destabilize or noticeably alter any
important attribute of the relevant resource, *id*. at 1-6 (JA071). With
respect to climate change, the Commission determined (1) that
continued operations would have only small contributory impacts on
climate change; and (2) that the effects of climate change on resource
conditions (i.e., on the resources and subject matters considered in the
agency's generic and site-specific environmental analyses) were
properly characterized as a Category 2 issue:

> Climate change can have additive effects on environmental
> resource conditions that may also be directly impacted by
> continued operations and refurbishment during the license
> renewal term. The effects of climate change can vary
> regionally and climate change information at the regional
> and local scale is necessary to assess trends and the impacts
> on the human environment for a specific location. The
> impacts of climate change on environmental resources
> during the license renewal term are location-specific and
> cannot be evaluated generically.

Generic EIS at 2-14 (JA082).

The Generic EIS also contains a comprehensive description of the environmental impacts of postulated accidents[3] at nuclear power plants, including both so-called "design-basis accidents" (i.e., accidents that a nuclear facility must be designed and built to withstand without loss to the systems, structures, and components necessary to ensure public health and safety) and severe accidents (those involving damage to the reactor core, which is where nuclear fuel is irradiated).  The agency supported its analysis with an Appendix, spanning more than 100 pages, that expanded the analysis contained in its prior generic evaluations of accidents.  *Id.* at E-1 to E-109 (JA245-353).  Among other things, the NRC evaluated prior accidents, *id.* at E-2 to E-7 (JA246-251); considered the impact of new information relating to accidents caused by both internal and external events, *id.* at E-7 to E-37 (JA251-281); evaluated the impact on accidents of trends in the nuclear industry such as power uprates and higher fuel "burnup," *id.* at E-45 to E-51 (JA289-295); and examined new information on the consequences of spent fuel pool accidents, including quantifying the likelihood of early

---

[3] The term "accident" refers to any unintentional event outside the normal plant operational envelope that results in a release or the potential for release of radioactive materials into the environment.

fatality risks and latent cancer fatality risks from such accidents.  *Id.* at

E-57 to E-65 (JA301-305).

The agency concluded on a generic basis that the impacts of

accidents were "small" (owing, in the case of design-basis accidents, to

the fact that the plants are designed to withstand such accidents

without adverse impact; and, in the case of severe accidents, to the low

probability-weighted consequences of such occurrences).  *Id.* at 2-13, 2-

21, 4-131,  (JA081, 084, 089).  The NRC supplemented this analysis

with a nearly 100-page discussion in Appendix E and approximately

130 pages of responses to comments on the analysis in Appendix A.

Generic EIS at A-99 to A-230, E-1 to E-109 (JA098-229, 245-353).  And

the NRC further concluded, on a generic basis, that alternatives to

mitigate severe accidents did not require further site-specific analysis

because, for plants that had already prepared such an analysis at the

time of original licensing or initial license renewal, there was little

likelihood that any cost-beneficial improvements could be identified.  *Id.*

at 2-13, 4-132, E-84 to E-92 (JA081, 090, 328-336).[4]

---

[4] A "severe accident mitigation alternative" is a possible plant design
modification that may lessen the severity of an accident should one
occur or reduce the likelihood of an accident occurring.  In the

The NRC's review of accident risk, which updated the Commission's original analysis of this issue in the 1996 Generic EIS and the 2013 Revision, *id.* at E-2, E-8 to E-9 (JA246, 252-253), was detailed, comprehensive, and reflective of expertise gained by the agency during decades of regulatory oversight.  The 1996 analysis had assessed the environmental impacts of severe accidents by developing estimates of population dose risk for each reactor (i.e., the cumulative exposure to radiation to the surrounding population stemming from an accident) from analyses for operating reactors for which a severe accident analysis had been performed at the time of original licensing and concluded that the probability-weighted risk posed by all accidents was small because it "represent[ed] only a small fraction of the risk to which the public is exposed from other sources."  *Id*.

Revision 2 of the Generic EIS compared the population dose risk estimate from the 1996 analysis for each plant to more recent site-specific analyses performed as part of the agency's obligation to

---

rulemaking accompanying the codification of the 2013 Generic EIS, the NRC explained that an analysis of such alternatives must be considered at the time of license renewal for plants that have not yet prepared one, but that only one such analysis was required.  78 Fed. Reg. at 37,313. *See generally Nat. Res. Def. Council v. NRC*, 823 F.3d 641, 644-45 (D.C. Cir. 2016).

evaluate severe accident mitigation alternatives. *Id.* E-9 to E-12 (JA253-256). The more recent analyses included updated core damage frequency[5] values; "updated analyses of containment performance under severe accident conditions"; and an updated consequences analysis that contained "plant-specific information about radionuclide source terms,[6] radionuclide releases, projected population distribution during the license renewal period, meteorological data, and emergency response." *Id.* at E-12 (JA256).

That comparison showed that the estimated population dose risks in the 1996 analysis were "higher by factors ranging from 3 to over 1,000 and . . . on average a factor of 120 higher than the corresponding total [population dose risk] values from the [more recent] analyses." *Id.* at E-12 (JA256). In other words, the agency concluded that the

---

[5] "Core damage frequency" is a measure of the likelihood that, given the way a reactor is designed and operated, an accident could cause the fuel in the reactor to be damaged. Damage to fuel in the reactor core is a primary driver of radiological releases with consequences to the public. *See generally* https://www.nrc.gov/about-nrc/regulatory/risk-informed/pra.html (last visited April 21, 2025) (describing the role of core damage frequency in performing probabilistic risk assessment to assess reactor safety).

[6] "Source term" refers to the types and amounts of radioactive or hazardous material released to the environment following an accident.

"probability-weighted consequences due to severe accidents to the public and environment are *smaller* than predicted" in the 1996 analysis. *Id.* (emphasis added). Accordingly, the NRC reaffirmed the prior conclusion that the impacts of severe accidents are small. *Id.* And the NRC explained that the information from the license renewal analyses "demonstrate[d] the magnitude of conservatism used in the 1996 [Generic EIS]-predicted values, both from the standpoint of reduced consequences using more recent plant-specific information and the conservativism built into" the 1996 analysis. *Id.* at E-13 (JA257).

But the Commission did not end its analysis there. It also considered additional new information that had become available since the 1996 analyses and more recent analyses of population dose risk, including new information related to: (1) internal event risk, (2) external event risk, (3) source terms, (4) power uprates, (5) fuel burnup levels, (6) low power and shutdown conditions, (7) spent fuel pools, and (8) a report addressing the biological effects of ionizing radiation. The Commission then evaluated whether this new information could impact its overall small finding for severe accidents. *Id.* With respect to external event risks, the agency recognized that the "events that

contribute the most to plant risk are seismic and fire events." *Id.* at E-23 (JA263). It further explained that "high winds, floods, tornadoes, and other external hazards may also contribute to plant risk"; that "these contributions are generally, but not always, much lower than those from seismic and fire events"; and that these impacts had been considered and incorporated into its analysis, as applicable. *Id.*

After evaluating information on these factors, the NRC conservatively estimated that these factors could lead to an increase in the estimates of severe accident risk of "up to a factor of 4 to 5, or 400 to 500 percent" over the 1996 estimates of population dose risk. *Id.* at E-93 (JA337). To assess whether that possible increased risk should alter the 1996 Generic EIS's conclusion that the estimated environmental impacts of severe accidents are small, the NRC compared the possible risk increase to the reduction in risk reflected in the updated population dose rate values. Because the updated analysis showed reduced population dose rates on average by "a factor of 120 (or 12,000 percent)," the NRC concluded that the "net effect of an increase on the order of 400 to 500 percent and a decrease of more than 10,000 percent would be a substantial reduction in estimated impacts." *Id.*; *see also id.* at E-10 to

E-12 (JA254-256) (identifying the reduction in risk profile for individual plants). In other words, the magnitude of the decrease in reduction population dose rate values substantially outweighed any increased risks that had been identified, and these risks, assessed against other considerations that more than offset them, did not provide a basis for altering the conclusion that the expected environmental impacts of severe accidents is small.

Petitioners submitted comments to the agency criticizing, in particular, the assessment of the impacts of accidents contained the in the Draft Generic EIS. Among other things, Petitioners asserted that the "technical methods" employed by the NRC were "grossly outdated," Corrected Comments of Beyond Nuclear and Sierra Club (May 19, 2023) at 3 (JA570); that the Draft Generic EIS made "unsupported claims to improved safety," *id.* at 4 (JA571); that the Draft Generic EIS failed to take into account new and significant information affecting accident risk, including the effects of climate change on accident risk, *id.* at 5 (JA572), the contribution of equipment aging to accident risks, *id.* at 6 (JA573), and aging problems such as embrittlement and corrosion that had been identified as early as 2014, *id.* at 7 (JA574).

The NRC responded to each of Petitioners' comments.  With respect to aging, the NRC communicated that it disagreed with the comments because issues related to management of aging systems, structures, and components had been addressed by the NRC's safety review with respect to passive systems, structures, and components and by the NRC's ongoing regulatory oversight for active systems, structures, and components.  Generic EIS at A-212 (JA211).[7]  It further observed that the NRC had analyzed the issues that Petitioners had identified in various iterations of Generic Aging Lessons Learned reports that it had prepared, and that, while there was "some uncertainty regarding the future of nuclear power plants during the extended period" of plant operations, the agency's  "robust" Maintenance Rule, 10 C.F.R. § 50.65,[8] and its ongoing reactor oversight

---

[7] Passive systems, structures, and components "are those that perform an intended function without moving parts or without a change in configuration or properties."  Final Rule, Nuclear Power Plant License Renewal; Revisions, 60 Fed. Reg. 22,461, 22,477 (May 8, 1995).  By contrast, "a pump or valve has moving parts, an electrical relay can change its configuration, and a battery changes its electrolyte properties when discharging."  *Id.*  These components are thus considered active.

[8] 10 C.F.R. § 50.65(a)(1) provides:

22

activities were designed to minimize uncertainty due to aging.  *Id.* at A-212 to A-213 (JA211-212).[9]

Petitioners likewise made a series of arguments asserting that the agency's analysis of accident risk must take into account the effects of climate change, including that these evaluations must be performed on a site-specific basis rather than generically, *id.* at A-220 (JA219), and that accident analysis must consider both internal and external sources,

---

> Each holder of an operating license for a nuclear power plant . . . shall monitor the performance or condition of structures, systems, or components, against licensee-established goals, in a manner sufficient to provide reasonable assurance that these structures, systems, and components, as defined in paragraph (b) of this section, are capable of fulfilling their intended functions.  These goals shall be established commensurate with safety and, where practical, take into account industrywide operating experience.  When the performance or condition of a structure, system, or component does not meet established goals, appropriate corrective action shall be taken.

[9] A renewed operating license contains conditions to ensure applicants appropriately manage aging during the period of extended operation. 10 C.F.R. § 54.29(a)(1); *see also* 56 Fed. Reg. at 64,946 ("The licensing basis for a nuclear power plant during the renewal term will consist of the current licensing basis and new commitments to monitor, manage, and correct age-related degradation unique to license renewal, as appropriate.").  NRC inspection oversight ensures compliance with license conditions, including those related to aging management.  As the Commission has explained this oversight program is "aggressive and ongoing."  *Florida Power & Light*, 54 N.R.C. at 8.

*id.* at A-221 (JA220). The NRC agreed in part with these comments, noting that the effects of climate change had in fact been considered throughout the Generic EIS, but that the impacts of future changing phenomena would not affect the agency's analysis of accidents or its conclusion that the probability-weighted determination that impacts were likely to be small because of the large margins supporting the agency's assessment of accident risk. *Id.* at A-222 (JA221). The NRC further observed that, as part of its Reactor Oversight Process, the agency will evaluate any new information related to changing environmental conditions to determine whether any safety-related changes are needed at existing nuclear power plants. *Id.*

Many commenters raised issues relating to the agency's generic conclusion that no additional analysis of severe accident mitigation alternatives would be required for plants that had already conducted such an analysis. *See, e.g.*, Generic EIS A-192 to A-197 (JA191-196). However, none suggested, as Petitioners do here, that the agency's determination was flawed because it failed to take into account the effects of climate change on accident risk.

## SUMMARY OF ARGUMENT

1.    The NRC's treatment of the effects of aging as part of its thorough analysis of reactor accidents fully complied with NEPA's rule of reason.  In assessing the impacts of reasonably foreseeable accident scenarios, the NRC determined, consistent with case law of this Circuit, that the NRC's safety review and its ongoing oversight of reactor operations would reasonably ensure compliance with regulations governing aging management prior to the occurrence of an accident. Nonetheless, the NRC's comprehensive modeling of accident scenarios conservatively included the failure of some plant equipment even though NRC regulations ensure licensees monitor and address degradation related to age that could contribute to an accident.  While NEPA requires a hard look at the impacts of agency action, it does not require the agency to model worst-case scenarios, invent new methodologies for evaluating accident scenarios that its regulatory scheme is designed to avoid, or to quantify risks that do not affect the agency's overall characterization of the probability-weighted impact of accidents.

2.    The agency likewise reasonably accounted for the effects of climate change in determining that the probability-weighted impacts of accidents are small.  Consistent with NEPA's rule of reason, the agency evaluated the threat posed by internal and external events based on current, updated information about the environment, as well as based on numerous other inputs to accident analysis such as changes in reactor operations and population trends.  And it determined, based on its own experience in responding to threats posed by natural phenomena, that its ongoing regulatory oversight of power plants will minimize any incremental increase in risk caused by changes in the environment.  Moreover, the Commission determined that the probability-weighted impacts of an accident are small.  And the Commission explained that the margins supporting that determination more than accounted for any incremental increase in risks that are likely to be associated with the effects of climate change.  To the extent that any further evolution in the environment can be meaningfully identified while the Generic EIS is in effect, the agency will consider, in connection with individual licensing determinations, whether this evolution paints a seriously different picture of the environment than

the one that exists now. NEPA does not require the modeling of worst-case scenarios, and the approach employed in the Generic EIS reasonably and sufficiently accounts for any increased risk due to climate change that may develop.

3. Based on its extensive experience, the NRC reasonably determined in the Generic EIS, as it had previously, that already-constructed nuclear power plants that had previously performed a severe accident mitigation alternatives analysis need not perform another such analysis when seeking license renewal. As the agency explained, one consideration of severe accident mitigation alternatives per site is sufficient to demonstrate that only modest alternatives are likely to be cost-beneficial and very few, if any, would significantly lower severe accident risk. This Court expressly endorsed this conclusion in 2016 and, as an application of the NRC's considerable expertise in reviewing applications for the renewal of operating licenses for scores of nuclear power plants, it continues to warrant deference. Petitioners failed to raise this challenge regarding severe accident mitigation alternatives before the agency, and they neither

acknowledge the Court's prior holding nor supply any evidence undermining the agency's highly experience-based conclusion.

## STANDARD OF REVIEW

This Court's review is governed by the Administrative Procedure Act, which permits this Court to set aside an agency order only where it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); 42 U.S.C. § 2239(b); *see also CTIA-Wireless Ass'n v. FCC*, 466 F.3d 105, 112-17 (D.C. Cir. 2006). Thus, agency factual conclusions are reviewed for "substantial evidence," a standard more deferential than the "clearly erroneous" standard for appellate review of trial court findings. *See Dickinson v. Zurko*, 527 U.S. 150, 162, 164 (1999). This narrow standard requires the Court to uphold an agency decision provided the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (internal quotation marks omitted); *see also Transcon. Gas Pipe Line Corp. v. FERC*, 518 F.3d 916, 919 (D.C. Cir. 2008).

Where the issues raised involve NEPA compliance, the Court should set aside the agency's substantive findings only where it has committed a clear error of judgment. *Blue Ridge Envtl. Def. League v. NRC*, 716 F.3d 183, 195 (D.C. Cir. 2013); *see WildEarth Guardians v. Jewell*, 738 F.3d 298, 308 (D.C. Cir. 2013) (courts do not "flyspeck" an agency's environmental analysis looking for minor deficiencies). Indeed, courts "must give deference to agency judgments as to how best to prepare an EIS." *Indian River Cty. v. Dep't of Transp.*, 945 F.3d 515, 533 (D.C. Cir. 2019). Because the NEPA process "involves an almost endless series of judgment calls," the "line-drawing decisions necessitated" by that process "are vested in the agencies, not the courts." *Duncan's Point Lot Owners Ass'n v. FERC*, 522 F.3d 371, 376 (D.C. Cir. 2008). And when a high level of expertise is required, such as when the NRC makes "technical judgments and predictions" at the "frontiers of science," this Court must defer to the agency's weighing of the evidence as long as its decisionmaking is informed and rational. *See Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377 (1989); *Blue Ridge*, 716 F.3d at 195 (citing *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 103 (1983)).

## ARGUMENT

Rather than taking genuine issue with the Generic EIS's nuanced and updated examination of severe accidents, Petitioners use their Brief largely as an opportunity to air past grievances about the NRC's resolution of safety issues. Regarding aging management, Petitioners base their argument on the premise that while the NRC staff "recommended amending the Part 54 safety regulations in" SECY-14-0016,[10] the Commission rejected that recommendation and chose instead to rely on non-binding guidance" and thereby failed to adequately address specific aging management issues during a second license renewal period. Brief at 42. On climate change, Petitioners' argument similarly dismisses the adequacy of the Commission's safety regime to ensure plants are safely designed to withstand natural phenomena. *Id*. at 51. But Revision 2 to the Generic EIS is about

---

[10] This document, which is publicly available at https://www.nrc.gov/docs/ML1405/ML14050A306.pdf, was prepared by the NRC Staff and submitted to the Commission in 2014 as a means of communicating plans and presenting to the Commission options for addressing anticipated applications for subsequent license renewal applications. It was not a part of the record relating to the Commission's promulgation of the Rule challenged in this Petition for Review and is not listed in the Certified Index.

assessing the environmental impacts of license renewal. It was not a proceeding for relitigating the Commission's approach to regulating the safety of nuclear power plants.

To be sure, Petitioners seek to avoid this result by claiming that their safety grievances reveal flaws in the severe accident analysis contained in the Generic EIS. However, as explained in the Sections that follow, Petitioners have not made such a demonstration. Petitioners' challenges fail to show that the NRC made any unsupported assumptions in the Generic EIS, that the agency's characterization of the reasonably foreseeable impacts in the Generic EIS lacks a demonstrated evidentiary basis, or that further consideration of the issues they raise would yield meaningfully different results than what the agency concluded in the Generic EIS.

I.    **Further Consideration of Aging Management Would Not Change the Conclusion in the Generic EIS that the Impacts of Severe Accidents Are Small.**

A.    **The NRC Reasonably Presumed Compliance with Its Regulations in Analyzing Severe Accidents under the Generic EIS.**

Petitioners assert that the NRC's assessment of accident risk in the Generic EIS is flawed because the agency failed to incorporate the effects of aging-related degradation into its analysis.  Brief at 43-44 (criticizing the NRC's determination that the effects of aging are addressed and minimized through the NRC's safety review and its ongoing regulatory oversight).  In support of this claim, Petitioners cite *Limerick Ecology Action, Inc. v. NRC*, 869 F.2d 719, 729-31 (3d Cir. 1989), for the proposition that the NRC's safety oversight does not restrict or narrow its NEPA responsibilities.  In light of this supposed deficiency, Petitioners contend that the Generic EIS and the Rule contravene NEPA.  *Id*. at 43, 50.

Petitioners' argument rests on misreadings of both the Generic EIS and *Limerick*.  Contrary to Petitioners' assertion, the Generic EIS does not seek to rely on the NRC's safety regulations for license renewal to avoid NEPA compliance.  Nor does the NRC assert that the AEA

"precludes" NEPA compliance.  *See Limerick*, 869 F.2d at 729.[11]  Rather,

the NRC has *acknowledged* that the risk of severe accidents is an

environmental impact of license renewal that the agency must consider.

And as noted above, pp. 15-21, the revised Generic EIS undertakes a

detailed consideration of severe accident risk that built on the

Commission's thorough analysis of the issue in the 1996 Generic EIS

and evaluated whether any new information developed since then—

with the benefit of twenty-five years of additional experience and scores

of license renewals—would alter the agency's conclusions.  The agency

employed a systematic method: it compared new information that

---

[11] The NRC likewise does not maintain that its AEA review of severe accidents constitutes the "functional equivalent" of a NEPA review. *Limerick*, 869 F.2d at 729 n.7.  However, the NRC has a strong basis for concluding that the regulatory regime that the agency has developed and the expertise it has gained in the years since the Three Mile Island accident in 1979 have effectively addressed and minimized the risk posed by beyond-design-basis accidents.  *See, e.g.*, Final Rule, Mitigation of Beyond-Design-Basis Events, 84 Fed. Reg. 39,684, 39,684 (Aug. 9, 2019); Final Rule, Consideration of Aircraft Impacts for New Nuclear Reactors, 74 Fed. Reg. 28,112, 28,116 (June 12, 2009); Final Rule, Power Reactor Security Requirements, 74 Fed. Reg. 13,926 (Mar. 27, 2009); Final Rule, Monitoring the Effectiveness of Maintenance at Nuclear Power Plants, 64 Fed. Reg. 38,551 (July 19, 1999); Final Rule, Station Blackout, 53 Fed. Reg. 23,203, 23,204 (June 21, 1988); Final Rule, Reduction of Risk from Anticipated Transients Without Scram (ATWS) Events for Light-Water-Cooled Nuclear Power Plants, 49 Fed. Reg. 26,036, 26,045 (June 26, 1984).

suggested the risk of severe accidents was lower than estimated in 1996 and compared that conclusion to new information that could show the risk was higher.  Ultimately, the NRC found that the balance leaned heavily in favor of the conclusions that the anticipated environmental impacts from severe accidents is small.  *See* Generic EIS at E-92 to E-94 (JA336-338).

In conducting this analysis to satisfy NEPA, the NRC reasonably relied on information that it obtains through its safety review.  Pursuant to Part 54, license renewal applicants "must take adequate steps to account for aging during the period of extended operation."  Generic EIS at E-1 (JA245).  Upon its review of the safety aspects of an application, the NRC must conclude that plant operation during the license renewal period "would continue to provide a level of safety equivalent to that during the current license term" for the license renewal to issue.  *Id*. (JA245); *id*. at E-8 (JA252) (explaining that the NRC must find "there is reasonable assurance that activities authorized by the renewed license will continue to be conducted in accordance with the current licensing basis"); *see also* 10 C.F.R. § 54.33(b).  In light of the assurances necessarily developed in individual licensing

proceedings, the NRC disagreed with the Petitioners that its probabilistic risk assessment of severe accidents needed to incorporate an increasing failure rate due to aging. *Id.* at A-212 to A-213. (JA211-212). Such technical judgments regarding the modeling of uncertain risks are core matters of agency expertise and are entitled to deference from the courts. *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983).

The NRC's thorough consideration of the possible contribution of aging components to severe accident risk belies Petitioners' assertion that the NRC relied on Part 54 to avoid *considering* severe accidents; rather it relied on Part 54's robust approach to aging management—and its presumption that licensees would comply with NRC regulatory requirements, as is required by law—to *support* its analysis of these accidents. Informing the agency's evaluation of severe accidents with adherence to NRC regulations fully comports with NEPA's "rule of reason." *Public Citizen*, 541 U.S. at 767. Moreover, it is precisely the type of agency expert judgment and "line drawing" inherent to the NEPA process that courts have historically been careful not to disturb. *See Duncan's Point Lot Owners Ass'n, Inc.*, 522 F.3d at 376.

Indeed, many courts have upheld agency reliance on expected compliance with applicable regulations and ongoing regulatory oversight to evaluate environmental impacts. For example, in 2016 this Court concluded in *New York v. NRC* that the NRC itself is entitled to presume such compliance as part of effort to make a reasonable assessment of environmental impacts on a generic basis. 824 F.3d at 1021 (upholding the agency's determinations concerning the generic risks of leaks from spent fuel pools in light of NRC regulations requiring leak detection); *cf. Methow Valley,* 490 U.S. at 357 (NEPA does not require a "worst case" analysis).

Likewise, in *Public Citizen v. National Highway Traffic Safety Administration*, then-Judge Ginsburg, writing for this Court, found that an agency could reasonably conclude that impacts on air quality would be minimal when "possible increases in emissions [would fall] *within* the Clean Air Act's limits." 848 F.2d 256, 267-68 (D.C. Cir. 1988). In support of its conclusion, the court pointed to several circuit court precedents for the proposition that compliance with local zoning regulations could also support a finding that the environmental impacts from a construction project would not be significant. *Id.* (citing, *e.g.,*

*Maryland-National Capital Park & Planning Comm'n v. U.S. Postal Serv.*, 487 F.2d 1029, 1036-37 (D.C. Cir. 1973)). The Ninth Circuit employed a similar analysis in *City of Carmel-by-the-Sea v. Dep't of Transp.*, 123 F.3d 1142, 1151-55 (9th Cir. 1997), relying on the future permitting process under the Clean Water Act and oversight from local governments to uphold an agency's evaluation of environmental impacts. As in these cases, the NRC did not invoke its Part 54 regulations to avoid or replace a NEPA analysis; instead, the agency reasonably relied on anticipated compliance with them in attempting to identify (and not overstate) the most likely outcome of a severe accident.

Moreover, in response to comments submitted by Petitioners, the NRC explained why modeling "increasing failure rate due to aging" would be inconsistent with the current state of the art for probabilistic risk assessments, which does in fact contemplate component failure. Generic EIS at A-213 (JA212). The NRC noted that, among other things, the probabilistic risk assessments assume a constant random failure rate and therefore did not require additional modeling. *Id*. Petitioners do not provide a basis to contest the reasonableness of this approach or explain why it is not entitled to deference.

Moreover, Petitioners' request would task the agency with developing an entirely new evaluation methodology to evaluate severe accidents. However, NEPA does not require agencies to embark on ground-breaking research projects. *Town of Winthrop v. FAA*., 535 F.3d 1, 12-13 (1st Cir. 2008). Petitioners' request for a more precise description of component failure rates due to aging asks for an analysis that is beyond what is required by NEPA's rule of reason. In any event, the request is unnecessary; assuming a random failure rate for passive components is conservative in light of the aging management requirements imposed by the Commission. And to the extent the failure rate is not quantified, the agency included an extensive uncertainty analysis in the Generic EIS to account for such unknowns. Generic EIS at E-67 to E-84 (JA311-328).

Finally, in support of their argument Petitioners point to this Court's 2012 decision in *New York v. NRC*, 681 F.3d 471, 479 (D.C. Cir. 2012) (which led to the remand resulting in the 2016 *New York* decision mentioned above), for the proposition that a "finding of 'reasonable assurance' of safety under the Atomic Energy Act is 'a far cry' from finding the likelihood of a significant adverse environmental impact to

38

be 'remote and speculative.'" Brief at 44. True enough. But as explained above, pp 22-23, the Generic EIS does not conclude that severe accidents are "remote and speculative" in light of the safety regime mandated by Part 54. Rather, the agency reasonably assumed compliance with those regulations in preparing a detailed and technically sophisticated evaluation of the likely effects of a severe accident in the Generic EIS. Thus, this case is unlike the 2012 decision in *New York*, where the Court faulted the agency for eschewing preparation of an EIS altogether because the agency found the action involved no significant impacts. 681 F.3d at 479. The agency here has recognized the potential for environmental impacts and has evaluated the most likely extent of those impacts in a full EIS. NEPA requires no more.

### B. The NRC's Underlying Safety Review of Aging Management Is Not Before the Court.

As explained above, pp. 34-35, the adequacy of the NRC's aging management regulations for ensuring reactor safety is an issue outside the scope of its NEPA review, and the NRC's reliance on those regulations to evaluate severe accidents was reasonable under NEPA caselaw. Thus, the Court should not entertain Petitioners' argument,

Brief at 40-43, that the NRC's regulations in 10 C.F.R. Part 54 inadequately account for aging management. Nonetheless, even if considered in connection with their NEPA claim, Petitioners' arguments do not support the assertion that the agency has failed to consider the effects of aging management during the period of extended operation.

Petitioners assert that the NRC has "conceded" that the effects of aging equipment on accident risk are reasonably foreseeable and uncertain. Brief at 41. But the agency has made no such concession. The NRC's statement in the original 1996 version of the Generic EIS— that the effects of aging are a "key subject" of its environmental review, Br. at 40 (citing 1996 Generic EIS at 5-10 (JA365))—reflects the truism that the agency's environmental review should center on the purpose of license renewal, i.e., aging management. The agency's unremarkable acknowledgment that "there may be some uncertainty regarding the future of nuclear power plants in the [period of extended operation]," *id.* at 41 (citing Generic EIS at A-213 (JA212), only recognizes the inherently unpredictable nature of projections about the future. The agency's prediction—formed after decades of reactor oversight and scores of license renewals— that it will employ the tools in its

regulatory toolkit, and that licensees will comply with the robust regulatory regime to manage the effects of aging, is a reasonable response to future uncertainty.

Further, Petitioners' argument takes the agency's discussion of uncertainty out of context. While the NRC acknowledged some operating uncertainty during the second license renewal period in response to Petitioners' comments, the agency also reaffirmed that its safety regulations are adequate to address that uncertainty. To comply with those safety regulations, the NRC noted that license renewal applicants must "ensure that appropriate actions are taken to maintain safety *prior* to component failure." Generic EIS at A-213 (JA212) (emphasis added). Thus, while plant component failure due to aging during the license renewal period is not impossible, the NRC's license renewal regulations provide a reasonable basis for assuming that licensees will take appropriate action to identify degraded conditions, evaluate aging issues, and maintain safety to minimize the likelihood of such failure.

Finally, Petitioners present an extended discussion on page 42 of their Brief criticizing the Commission's 2014 determination not to alter

its Part 54 regulations. This argument, which relies on "knowledge gaps" identified in documents that are not part of the rulemaking record, is plainly beyond the scope of the issues before the Court. But to the extent that there is relevance to Petitioners' assertion that the agency is "bucking resolution of uncertainties and knowledge gaps to licensees," *id.* at 43, they misread the underlying materials. The Generic Aging Lessons Learned reports that Petitioners reference merely reflect the reality that a licensee seeking to renew its license must demonstrate, as a precondition to license renewal, that there is a technical basis upon which to conclude that license renewal is appropriate. The license will only be renewed based upon a determination that the licensee will in fact be able to safely manage the effects of aging. Thereafter, the NRC reasonably expects to be able to rely upon the licensee's commitments, as well as the portfolio of tools at the agency's regulatory disposal, to ensure that the risk of an accident is not meaningfully affected by the possibility of aging-related equipment degradation.

And, insofar as Petitioners suggest that the Lessons Learned reports do not adequately account for previously identified aging issues

(and, in particular, the aging of power plant reactor vessels), Brief at 13-15, 41-42, their conclusion is also based on a selective reading of those documents. Those documents explain that the NRC, working with the Department of Energy "completed [an] Expanded Materials Degradation Assessment" in 2014. 2017 Generic Aging Lessons Learned Report at xxvii (JA508); 2023 Draft Generic Aging Lessons Learned Report at xxiii (JA562). The Degradation Assessment "covers the reactor vessel, primary system piping, reactor vessel internals, concrete, and electrical cables and qualification." 2017 Generic Aging Lessons Learned Report at xxvii (JA508).

And the NRC used the results of this study "to identify aging management programs that will require modification for" second license renewals. *Id.* For example, the NRC added a new aging management program on Neutron Fluence Monitoring for reactor vessel components to the 2017 Lessons Learned Report for subsequent license renewal. *Id.* at X.M2-1 (JA512). Similarly, the NRC modified the Reactor Vessel Material Surveillance program to address the use of surveillance capsules during the subsequent license renewal period. *Id.* at XI.M31-1 (JA510). Therefore, contrary to Petitioners' assertions, the NRC's

43

safety review for license renewal does not ignore identified contributors to age-related degradation, and the agency's reliance on the robustness of this review does not reflect a flaw in its NEPA analysis.

Finally, we emphasize that the NRC already has established processes for resolving safety concerns. If, in connection with any pending license renewal application, Petitioners have information suggesting that an applicant has failed to show that the plant will safely manage aging during a license renewal period, they can request a hearing. *See* 10 C.F.R. § 2.309. Additionally, Petitioners are always free to raise any safety issue with respect to an NRC licensee through the NRC's enforcement process. *Id*. § 2.206. However, using NEPA as an unbounded opportunity to revisit long-resolved safety questions is not one of those processes.

## II.    The NRC Reasonably Accounted for Any Effects of Climate Change in Performing Its Severe Accident Analysis.

### A.     The NRC's Reliance on Its Regulatory Processes Complies with NEPA's Rule of Reason.

Petitioners assert that the Final Rule and Generic EIS unreasonably fail to consider the impacts of climate change on severe accidents. Brief at 45-49, 53-56. Petitioners contend that climate

44

change may "affect the likelihood and severity of reactor accidents at individual sites" through extreme weather events, such as storms or flooding. *Id.* at 26.

We observe at the outset that Petitioners' arguments obscure the difference between two separate issues. Petitioners cite *New Jersey Conservation Foundation v. FERC*, 111 F.4th 42, 55 (D.C. Cir. 2024), for the proposition that "climate change impacts are reasonably foreseeable and potentially significant." But that case concerned the effect of greenhouse emissions of a proposed project *on* climate change. Here, however, the Commission has acknowledged the effects of climate change across various regions of the country. Generic EIS at 2-13; G-32-36 (JA081, 355-359). The relevant question thus is not whether climate change needs to be considered as part of the agency's environmental analysis. Nor is it, as Petitioners contend (Brief 46-47), whether climate change is *itself* an indirect or cumulative impact of the agency's licensing decision (since, unlike *New Jersey Conservation Foundation*, there is no assertion here that licensing the facilities at issue would contribute to greenhouse gas emissions). Rather, the question for the Court's review is the extent to which the agency's

analysis of reactor accident risk is somehow deficient because, according to Petitioners, it fails to take into account climate change, along with numerous other variables, in evaluating this risk.[12]

Petitioners identify no deficiency in this regard. The NRC *did* consider "high winds, floods, tornadoes, and other external hazards" as part of its analysis of the impacts of external events on severe accidents, and it expressly concluded that, as a general matter, the contributions to risk from these types of events were "much lower" than those attributable to fires and seismic events. Generic EIS at E-23 (JA267). And as part of this analysis, the NRC extensively considered new sources of information related to external events in updating the findings from the 1996 analysis. *Id.* at E-22 to E-37 (JA266-281).

Petitioners do not challenge any component of this review. Instead, they ask the NRC to revisit the analysis to more fully consider "the fast-moving and increasingly severe weather changes associated

---

[12] Petitioners appear to concede the distinction between the case law on which they rely and the argument that they present to the Court when they assert that "it is a logical progression to move from examining the impact on climate change on the environment surrounding" a facility— the issue on which the discussion in *New Jersey Conservation Foundation* was focused—"to evaluating its effect on the [facilities] themselves." Brief at 55.

with climate change." Brief at 48. But, as even their comment suggests, information about future trends in climate-related changes is quickly developing and subject to revision. Rather than trying to forecast the external hazards sites will face in coming years as a result of evolving environmental phenomena, the NRC reasonably relied—as it does when it performs its primary role of protecting the public from radiological hazards—on existing (though updated) data to project the likely consequences of severe accidents. That projection showed that the probability-weighted impacts of severe accidents caused by all external sources (including phenomena that might be affected by climate change) is small. It is difficult to believe that Congress, in crafting a standard that imports a page-limited rule of reason, required the agency to identify with mathematical precision how future climate-related changes—against which the agency remains vigilant and that are themselves not the primary drivers of accident risk—might affect the likelihood of an accident. *See, e.g.*, *Laguna Greenbelt, Inc. v. Dep't of Transp.*, 42 F.3d 517, 526 (9th Cir. 1994) ("NEPA does not require us to decide whether an EIS is based on the best scientific methodology available or to resolve disagreements among experts.").

Nor is the NRC ignoring uncertainty regarding possible future effects of climate change.  In response to Petitioners' comments related to climate change, the NRC explained that "the NRC continually evaluates nuclear power plant operating conditions and physical infrastructure through its reactor oversight program to ensure ongoing safe operations."  Generic EIS at A-222 (JA221).  The NRC's regulations reflect the agency's broad authority to take appropriate action to ensure safety. 10 C.F.R. § 2.202.  Moreover, the regulations also provide mechanisms for the agency to learn about changing conditions that may pose safety risks, such as revised external hazards estimates. 10 C.F.R. § 50.54(f).  And recently, the NRC has instituted a more formalized process to consider changes to plants' external hazards.  LIC-208, Process for the Ongoing Assessment of Natural Hazards Information (Nov. 20, 2019) (JA513).[13]  That process includes a system for the NRC

---

[13] While Amicus Miami Waterkeeper takes issue with the efficacy of this program, it relies on materials not in the record before this Court and directs its arguments toward challenging the agency's safety regime.  Brief of Miami Waterkeeper at 9-14.  If Miami Waterkeeper or others have new information that suggests the NRC should modify a rule or its procedures, NRC regulations allow them to petition the agency for a rulemaking.  10 C.F.R. § 2.801.  And contrary to Miami Waterkeeper's suggestion, as explained below, the NRC's oversight *has* previously led to reevaluations of plant licensing bases to reflect new

to collect new information on external hazards, *id*. at 5-7 (JA518-520), evaluate its significance, *id*. at 10-13  (JA523-526), and take appropriate action using the agency's existing oversight mechanisms, *id*. at 14 (JA527).

Moreover, the Generic EIS described significant regulatory action the NRC has historically taken in the past under its oversight authority to reevaluate the threat posed by external hazards, such as flooding. For example, in the 1990s, the NRC mandated an Individual Plant Examination of External Events for each reactor.  Generic EIS at E-3 (JA247).  As the agency chronicled, that examination resulted in improvements to "plant hardware, procedures, or training programs." *Id*. at E-89 (JA333).  The agency concluded that these improvements have lowered accident risk.  *Id*.  Moreover, the Generic EIS observed that following the 2011 tsunami that caused a disaster at the Fukushima plant in Japan, the NRC required each licensee to conduct "seismic and flooding hazard reevaluations."  *Id*. at E-6 (JA250).  The agency has completed its assessment of those reevaluations.  *Id*.  This reevaluation, as well as other actions taken following the events at

information on external hazards, and those reevaluations have resulted in substantial safety improvements.

Fukushima, have further improved plant safety and provide a basis for the agency to conclude that its regulatory processes will minimize the impacts of any climate-changed-related accidents in the future. *Id*. at E-4 (JA248).

Thus, the agency reasonably declined in the Generic EIS to embark on a new research project to attempt to quantitatively model for "fast-moving" climate change projections in its analysis of severe accidents. *Town of Winthrop*, 535 F.2d at 12-13. Rather, the NRC relied on its proven approach for overseeing plant safety to address new information on plant risk from changing external hazards. Based on this reliance, the NRC's analysis of severe accidents reasonably presumed that operating reactors' licensing bases will be updated as needed to appropriately account for external hazards, including any enhanced storm and flood risk posed by climate change, during the license renewal period. *New York*, 824 F.3d at 1021; *Public Citizen*, 848 F.2d at 267-68; *City of Carmel-by-the-Sea*, 123 F.3d at 1151-55. And, of course, to the extent that new data emerges that paints a seriously different picture of the environment at the time of any particular licensing action or that warrants departure from the Generic EIS on a

site-specific basis, the agency must consider whether it is appropriate to supplement the analysis in the Generic EIS. *Marsh*, 490 U.S. at 370-78; *see also New York*, 824 F.2d at 1021-22 (endorsing the NRC's waiver process under 10 C.F.R. § 2.335(b) for parties to raise site-specific issues in individual licensing proceedings).

Petitioners raise several objections to this approach, but each is unavailing. First, Petitioners assert that the Generic EIS erroneously ignores the impacts of climate change on severe accidents without making a finding that those effects "are 'so low as to be remote and speculative.'" Brief at 46 (quoting *New York*, 681 F.3d at 478)). Again, however, the Generic EIS does not presume that the impacts of enhanced external events from climate change on accident risk are remote and speculative. Rather, as discussed above, pp. 23-24, 34-35, the NRC's analysis of severe accidents reasonably relies on the agency's ongoing safety oversight to determine that these impacts will not meaningfully alter any particular plant's risk profile. Generic EIS at A-222 (JA221).

Next, Petitioners assert that the discussion of severe accidents in the Generic EIS "flouted NEPA's rule of reason" because it ignores

51

indirect effects and cumulative impacts.  Brief at 46-47 (internal quotation marks omitted).  First, Petitioners misapply the concepts of indirect and cumulative impacts. NEPA requires analysis of the indirect and cumulative impacts of the project (i.e., the license renewal) *on the environment*.  But Petitioners' argument is that the Commission failed to address the long-term effects of climate change on accident risk.  Thus, the Commission did not "flout[] NEPA's rule of reason" by limiting its analysis to the "potential environmental impacts of continued reactor operations," as Petitioners assert.

 Second, the NRC *did* recognize the potential long-term impact of climate change on accident risk as part of its overall analysis of external threats.  But the NRC found that the agency's ongoing and dynamic safety oversight program is sufficient to respond to reasonably foreseeable increased risks associated with climate change, Generic EIS at A-222. (JA221), such that it was unnecessary (and indeed would be unhelpful) to attempt to model those increases quantitatively.

Petitioners also contend that the Generic EIS "is arbitrary and capricious because it failed to provide a rational explanation for rejecting [recommendations from Council on Environmental Quality

guidance] to address climate change effects on the resilience of energy facilities." Brief at 55. But Petitioners do not identify any aspect of the guidance the NRC failed to heed, or any way in which the agency's NEPA analysis is deficient because of a failure to address "resilience." And while they suggest that the NRC's position is "confounding" because in 1996 it "acknowledged that the 'changing environment' and its impact on accident consequences [were] a key consideration in reactor license renewal review," *id.*, the agency has never wavered from its prior position or abandoned the need to assess "resilience." It has simply determined that the agency's ongoing response to changing conditions as part of its Reactor Oversight Process adequately minimizes evolving risks from changes to the environment, whatever they may be.

Finally, Petitioners challenge the NRC's reliance on its ongoing safety oversight because "nothing in the Atomic Energy Act precludes or limits NEPA." Brief at 49 (citing *Limerick Ecology Action*, 869 F.2d at 729-31). In a similar vein, Petitioners dismiss the NRC's safety review as a "vague promise of regulatory oversight," and contend that this Court has previously rejected attempts to substitute such oversight for

an environmental analysis. *Id*. at 52-53 (citing *New York*, 681 F.3d at 481). But these arguments, like analogous arguments directed at the agency's assessment of the effects of aging on accident risk, misread the Generic EIS. The NRC does not claim that its reactor oversight under the AEA precludes NEPA compliance or that it is a substitute for a NEPA review. Rather, the NRC reasonably relied on the existence and adaptive nature of that oversight process to inform its thorough evaluation of severe accidents under NEPA. Generic EIS at A-222. (JA221).

> **B.    Petitioners Have Not Demonstrated that Further Consideration of Climate Change Would Materially Alter the NRC's Evaluation of Severe Accidents.**

As noted above, pp. 17-21, in preparing the updated Generic EIS the NRC revisited the 1996 Generic EIS analysis of severe accidents to determine if the "small" finding remains valid. In that update, the NRC considered new information that could impact the previous finding, by suggesting the risk of severe accidents was either greater or lower than stated in the 1996 analysis. Generic EIS at E-92 (JA336). While the new information pointed in both directions, the data suggesting an increase in risk pointed to a four-to-five-fold increase, but the

information showing a decrease in risk demonstrated a reduction of "on average, about a factor of 120." *Id*. (JA336). In light of this significant margin—which Petitioners do not provide any basis to contest here—the NRC concluded that new information did not call into question the conclusion of the 1996 Generic EIS. If anything, new information showed that the 1996 analysis represented an extremely conservative approach to evaluating severe accidents.

In responding to Petitioners' comments, the NRC pointed to this margin as a reason why further modeling of the impacts of climate change on severe accident risk was unnecessary. *Id*. at A-222 (JA221). The NRC reasonably found that additional consideration of climate change impacts on severe accidents would be very unlikely to exceed that margin. *Id*. And the information presented in Petitioners' comment did not provide information that would call that conclusion into question. *Id*. While Petitioners may have preferred the agency take a different approach to responding to their comment, perhaps by updating or reformulating its analysis of severe accidents, the agency's methodology of relying on the extensive margin identified in the License

Renewal Generic EIS was reasonable. *Laguna Greenbelt,* 42 F.3d at
526.

In challenging this determination, Petitioners assert that the
Generic EIS does not "affirmatively demonstrate that these margins are
sufficient to account for the added risk posed by climate change
alongside the other factors for which safety margins were credited."
Brief at 54. But, as explained above, pp. 19-21, the Generic EIS
contained a rigorous evaluation of new information and concluded that
information showing the increase in reactor risk was insignificant when
compared to the overall identified reduction in risk. Generic EIS at E-
93 (JA337). Petitioners offer only conclusory allegations to suggest
otherwise.

This Court has repeatedly cautioned that challenges to a NEPA
analysis ought not "'flyspeck' the Commission's environmental analysis
for 'any deficiency no matter how minor.'" *Sierra Club v. FERC*, 827
F.3d 36, 46 (2016) (quoting *Theodore Roosevelt Conservation P'ship v.
Salazar*, 661 F.3d 66, 75 (D.C. Cir. 2011)). And this principle is all the
more applicable when it comes to a technical determination at the core
of an agency's expertise. Based on the margin described above, the

Generic EIS's assessment plainly provides enough information for decisionmakers and the public to understand the small probability-weighted risk posed by severe accidents, of which accidents related to possible climate change effects are only a small part. *Methow Valley*, 490 U.S. at 350. Calls for further analysis to more precisely estimate how climate change may contribute to the small environmental impacts of severe accidents from all causes constitute precisely the type of flyspecking courts have discouraged. Thus, the NRC correctly rejected Petitioners' demand for further consideration of the impacts of climate change on severe accident risk. *Id.* at A-222 (JA221).

This conclusion is all the more reasonable when considered in conjunction with the observation that the NRC will continue to take regulatory action to ensure that changes in the nature of external hazards will not significantly degrade safety. *Id.* Thus, there is a vanishingly small possibility that climate-change-induced changes to the external threat hazard would ever reach a point that would

undermine the agency's conclusion that the probability weighted impacts of severe accidents are small.[14]

Last, Petitioners claim that "the range of uncertainties covered by those margins is too big to be credible." Brief at 54. But many of the the examples pointed to by the Petitioners reflect a misreading of the Generic EIS. Petitioners claim that the document "relies on 'appropriate safety margins' to address Fukushima-like events" and "credits 'large inherent safety margins in the design and construction of spent fuel pools.'" *Id.* (citing Generic EIS at A-112, A-160 (JA111, 159)). But these quotes are from commenters on the Generic EIS, not the NRC. Petitioners also claim that the Generic EIS "'notes 'significant margins' between FLEX strategies and qualitative health objectives."[15] Brief at 54 (quoting Generic EIS at A-192 (JA191)). They fail to explain

---

[14] Citing *Limerick Ecology Action*, Petitioners also fault the NRC for not demonstrating in the Generic EIS how this analysis is the "'functional equivalent of the NEPA requirements.'" Brief at 54 (quoting 869 F.2d at 731). But again, unlike *Limerick Ecology Action*, here the agency does not point to this analysis as a substitute for a NEPA analysis of severe accidents; rather it is one of many parts of the agency's extensive NEPA analysis of that topic. Generic EIS at A-222, E-92 to 94 (JA221, 336-338).

[15] "FLEX strategies" refer to the actions described in Regulatory Guide 1.226, Flexible Mitigation Strategies for Beyond-Design-Basis Events (June 2019) (JA400).

how this reference (or, indeed, any of the "margins" to which they refer) in any way bolsters their case.

In sum, Petitioners have not shown that the NRC inappropriately relied on the large safety margins identified in the Generic EIS in responding to their comments. Rather, the agency reasonably relied on those margins to decline Petitioner's request to explicitly model the "fast moving" impacts of climate change within a single segment of the portion of the Generic EIS that addresses the effects of severe accidents. The rule of reason requires no more.

## III.    Petitioners Never Raised the Arguments They Present to the Court Concerning the Rule's Generic Resolution of Severe Accident Mitigation Measures, Which Are in Any Event Supported by Circuit Precedent and the Agency's Technical Analysis.

Finally, Petitioners fleetingly assert that the NRC's approach to severe accident mitigation alternatives in the Rule and Generic EIS violates NEPA's requirement to discuss mitigation measures. Brief at 56-58. To be sure, NEPA's obligation that agencies "discuss the extent to which adverse effects can be avoided," *Methow Valley*, 490 U.S. at 351-52 (citing 42 U.S.C. § 4332(C)(ii)), helps the decisionmaker and public fully understand the impacts of the action. *Id*. at 352. ("An

adverse effect that can be fully remedied by, for example and inconsequential public expenditure is certainly not as serious as a similar effect that can only be modestly ameliorated through the commitment of vast public resources.").  However, the Court has cautioned that this requirement does not require agencies to include "a detailed explanation of specific measures which *will* be employed to mitigate the adverse impacts of a proposed action."  *Id*. (internal quotation marks omitted).

In promulgating the final Rule, the Commission found that "[s]evere accident mitigation alternatives do not warrant further plant-specific analysis because the demonstrated reductions in population dose risk and continued severe accident regulatory improvements substantially reduce the likelihood of finding cost-effective significant plant improvements."  89 Fed. Reg. at 64,195.  Nonetheless, the final Rule provides an important caveat: "alternatives to mitigate severe accidents must be considered for all plants that have not considered such alternatives."  *Id*.  The Generic EIS explains that this carve-out reflects the Commission's long standing policy to consider a site-specific analysis of accident mitigation alternatives once for each reactor.

60

Generic EIS at E-84 to E-85 (JA328-329). In 2016, this Court

considered and upheld precisely this policy:

> Given how extensive the first [severe accident mitigation
> analysis] is, the Commission found a second analysis would
> not provide enough value to justify the resource expenditure.
> This determination is reasonable and so is entitled to
> deference.

*Nat. Res. Def. Council*, 823 F.3d at 652.

The Generic EIS simply follows the Commission's policy to only

consider severe accident mitigation alternatives one time, a policy this

court has previously found to be reasonable. Petitioners do not

challenge the holding in *Natural Resources Defense Council*. In fact,

they do not even cite the case. Rather, they contend that the treatment

of accident mitigation alternatives in the Generic EIS inappropriately

fails to consider new information on aging management in SECY-14-

0016 (a document that predates the decision in *Natural Resources

Defense Council* and was not part of the rulemaking record) and on

climate change set forth in guidance issued by the Council on

Environmental Quality.[16]  Brief at 56-58.  Its arguments are unavailing

for several reasons.

First, neither the Petitioners nor any other commenters asserted

that the Draft Generic EIS inappropriately failed to consider either

aging management and climate change generally or SECY-14-0016 or

the Council on Environmental Quality guidance specifically in its

analysis of severe accident mitigation alternatives.  The Supreme Court

has explained that "[p]ersons challenging an agency's compliance with

NEPA must 'structure their participation so that it . . . alerts the agency

to the [parties'] position and contentions,' in order to allow the agency to

give issue meaningful consideration."  *Public Citizen*, 541 U.S. at 764

(quoting *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council,*

*Inc.*, 435 U.S. 519, 553 (1978) (alterations in original)).  While the

agency received numerous comments on severe accident mitigation

---

[16] Additionally, Petitioners contend that the agency's accident mitigation alternatives analysis was incomplete because it did not include the "draft action plan describing steps the agency can take with regard to its facilities and operations to bolster adaptation and increase resilience to the impacts of climate change."  Brief at 56-57 (citing Generic EIS at F-12) (JA354).  However, as noted above, p. 60, NEPA does not require the development of a mitigation plan.  *Methow Valley*, 490 U.S. at 352.

alternatives, none of them raised issues relating to climate change or aging management. *E.g.*, Generic EIS at A-189 to A-194, A-228 to A-230 (JA188-193, 227-229). Therefore, the court should not consider Petitioners' argument because it was never raised before the NRC.

Moreover, Petitioners have not shown how a consideration of the information they point to on climate change or aging management would in any way affect, let alone undermine, the agency's conclusions. As this Court observed, the Commission's policy on severe accident mitigation alternatives reflects a reasonable determination that "a second analysis would not provide enough value to justify the resource expenditure." *Natural Res. Def. Council*, 823 F.3d at 652. Yet nowhere do Petitioners provided any information that would demonstrate that reconsidering these alternatives in light of the information they point to would yield sufficient value to justify an additional expenditure. Petitioners have not claimed that additional severe accident mitigation analysis considered in SECY-14-0016 or the CEQ guidance would identify additional cost-beneficial mitigation alternatives. And they certainly have not demonstrated that further consideration of these mitigation measures is needed to fully understand the impacts of severe

63

accidents as required by *Methow Valley*.  490 U.S. at 351-52.  Rather, as

the Generic EIS explains, and as this Court has previously concluded,

one consideration of severe accident mitigation alternatives per site is

sufficient to demonstrate that only modest alternatives are likely to be

cost-beneficial and very few, if any, would significantly lower severe

accident risk.  Generic EIS at E-84 to E-85 (JA328-329).  This

conclusion continues to warrant deference.

Finally, as discussed above, pp. 34-35, 48-50, the NRC's ongoing

regulatory processes already provide robust mechanisms to adequately

address component aging during periods of extended operation and to

account for changes to a plant's environment that could enhance risk.

These processes further reduce the likelihood that any information that

Petitioners might cite would provide useful insights into mitigation

alternatives.  Because Petitioners have offered nothing, beyond bare

speculation, to support their argument, the Court should reject it.[17]

---

[17] Based on the foregoing arguments, the Court should reject the
Petition in its entirety.  Nonetheless, if the Court remands all or part of
the Commission's consideration of severe accidents, the NRC requests
partial affirmance of the analysis of the remaining 79 issues in the
License Renewal Generic EIS and accompanying rule.  The Commission
has explained that the Generic EIS streamlines the license renewal
process by "identifying and assessing impacts that are expected to be

# CONCLUSION

For the foregoing reasons, the Court should deny the Petition for

Review.

Respectfully submitted,

/s/ Andrew P. Averbach                    /s/ Christopher Anderson

BROOKE P. CLARK                          ADAM R.F. GUSTAFSON
*General Counsel*                        *Acting  Assistant Attorney General*
ANDREW P. AVERBACH                       CHRISTOPHER ANDERSON
*Solicitor*                              *Attorney*
MAXWELL C. SMITH                         Environment and Natural Resources
*Senior Attorney*                        Division
U.S. Nuclear Regulatory                  U.S. Department of Justice
Commission                               Post Office Box 7415
11555 Rockville Pike                     Washington, D.C. 20044
Rockville, MD 20852                       (202) 353-1834
(301) 415-1956                           christopher.anderson3@usdoj.gov
andrew.averbach@nrc.gov

June 5, 2025
90-13-3-17756

---

generic (i.e., the same or similar) at all nuclear power plants or plants
with specified plant or site characteristics."  Renewing Nuclear Power
Plant Operating Licenses—Environmental Review, 88 Fed. Reg. 13,329,
13,332 (Mar. 3, 2023).  But that efficiency does not depend on any
interrelation between the issues.  Rather, the analysis of each issue
stands on its own, and the agency's determination on specific license
renewal applications is informed by the description, compiled after
completion of a Supplemental EIS, of *all* issues evaluated both on a
generic and a site-specific basis.  Thus, because the agency "would have
adopted the same disposition regarding the unchallenged portion if the
challenged portion were subtracted, partial affirmance" of the Rule and
accompanying EIS would be appropriate.  *Nasdaq Stock Mkt. LLC. v.
SEC*, 38 F.4th 1126, 1145 (D.C. Cir. 2022).

## CERTIFICATE OF COMPLIANCE

1.     This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) this document contains 12,592 words.

2.     This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Century Schoolbook font.

*/s/ Andrew P. Averbach*
Andrew P. Averbach

Counsel for U.S. Nuclear
Regulatory Commission